NATIONAL SURETY CORPORATION, Appellant,

v.

RAUSCHER, PIERCE & CO., Inc., Appellee.

No. 21903.

United States Court of Appeals
Fifth Circuit.

Dec. 13, 1966.

Rehearing Denied Feb. 13, 1967.

L. E. Elliott, of Brundidge, Fountain, Elliott & Churchill, Dallas, Tex., for appellant.

Paul Carrington, Fletcher L. Yarbrough, Jr., Dallas, Tex., Carrington, Johnson & Stephens, Dallas, Tex., of counsel, for appellee.

Before RIVES, BROWN and MOORE,* Circuit Judges.

* Of the Second Circuit, sitting by designation.

JOHN R. BROWN, Circuit Judge.

This appeal involves the question of liability under a Brokers Blanket Bond purchased to indemnify the Insured against any loss sustained due to dishonest, fraudulent or criminal acts of its employees and for court cost and reasonable attorney's fees incurred by the Assured in defending suits arising from such acts. The District Court sitting without a jury allowed Rauscher, Pierce and Company, Inc., the Assured, recovery in the amount of $73,131.07 against National Surety Corporation, the Bond underwriter. National Surety appeals from the decision.

Rauscher, Pierce, a company engaged in the brokerage of securities, was the Assured; National Surety, the Insurer. The Brokers Blanket Bond contained the usual fidelity clause indemnifying the employer (Assured) against loss due to the dishonest or fraudulent acts of its employees and providing for reimbursement of counsel fees and claims expense.[1] The loss claimed in this case grew out of a sale of Water Control and Improvement District Bonds by Rauscher, Pierce to Connecticut Mutual Life Insurance Company and State Mutual Life Assurance Company of America.[2] The facts of the transaction are not in dispute. In January 1957 Travis County Water District No. 9 had for sale Water Control and Improvement bonds. Rauscher, Pierce became interested in the purchase and resale of the bonds. Edward Volz, Manager of Institutional and Dealer's Sales for Rauscher, Pierce investigated the district for the purpose of ascertaining the value of the bonds and whether it would be a profitable venture for Raus-

cher, Pierce. The reports of Volz were very favorable and pursuant to his investigation he prepared an offering circular for use by Rauscher, Pierce in reselling the bonds. The circular, it was later discovered, contained numerous misstatements of fact pertaining to the population of the district, the assessed value of the land and improvements and the actual value thereof. Volz wrote letters to the Water Bond Purchasers which contained the same misstatements. With the letters he enclosed a copy of the offering circular and a copy of an engineer's report on the district. The engineer's report contained substantially the same misstatements. The Water Bond Purchasers in February 1957 in effect contracted to purchase the bonds from Rauscher, Pierce. Delivery was made in August 1957 in the total face amount of $1,365,000.

The transfer of the bonds entailed a three-step transaction. The Water District which issued the bonds made a commitment to sell the entire issue to Tucker and Company, the Underwriter, who gave a like commitment to sell the bonds to Rauscher, Pierce. The Water Bond Purchasers in turn purchased the bonds from Rauscher, Pierce. Rauscher, Pierce in 1961 discovered the falsity of the statements by Volz and notified the Water Bond Purchasers. Subsequently they filed suit against Rauscher, Pierce demanding the reimbursement of the purchase price in exchange for a return of the bonds. Notice was given by Rauscher, Pierce to National Surety of the pending suit, and demand was made that National Surety fulfill its indemnity bond obligation to defend the suit. National

---

1. "THE LOSSES COVERED BY THIS BOND ARE AS FOLLOWS:
    "FIDELITY
    "(A) Any loss through any dishonest, fraudulent or criminal act of any of the Employees, committed anywhere and whether committed alone or in collusion with others, including loss of Property through any such act of any of the Employees."
The Bond also contained a provision that:
    "The Underwriter will indemnify the Insured against court costs and reason-

able attorneys' fees incurred and paid by the Insured in defending any suit or legal proceeding brought against the Insured to enforce the Insured's liability or alleged liability on account of any loss, claim or damage which, if established against the Insured, would constitute a valid and collectible loss sustained by the Insured under the terms of this bond * * *."

2. We refer to them collectively as the Water Bond Purchasers.

Surety refused on the basis that the suit was not a claim which came within coverage of the bond. After the refusal by National Surety, Rauscher, Pierce engaged legal counsel and after extensive investigation, pretrial activity and negotiation, a compromise agreement was worked out with the Water Bond Purchasers.

The settlement took this form. The Water District was to reissue bonds containing terms, conditions and provisions more consistent with actual conditions of the district than those in the original bonds. The reissued bonds were to remain the property of the Water Bond Purchasers. Rauscher, Pierce agreed, however, to repurchase the reissued bonds within eleven years in ten installments at 75% of their face value even though the actual value at the time of purchase might be less. To the extent, therefore, that the market value of the reissued bonds was less than 75%, Rauscher, Pierce was certain to sustain a loss at these installment dates.

After the compromise Rauscher, Pierce instituted suit against National Surety to recover its costs and the damages sustained. The District Court found National Surety liable. The Court held that the loss was within the coverage of the Brokers Blanket Bond and "[b]y refusing to defend the suits, * * * [National Surety] came bound to pay to the plaintiff the cost of procuring counsel to defend such suits and the costs of the court * * *." Likewise, it became obligated " * * * to hold itself ready to pay whatever losses the plaintiff might sustain by reason of any judgment entered in such litigation." The Court allowed Rauscher, Pierce to recover $32,311.07 expended in defending the suits and $40,800 actual loss based on the repurchase of bonds on two of the agreed ten installments occurring in the interim. Also the Court found that National Surety was to reimburse Rauscher, Pierce for any future losses it might sustain due to the repurchase of the remaining installments.

National Surety urges two errors: (1) no liability exists on its part because the claim asserted by the Water Bond Purchasers did not come within the coverage of the indemnity bond, and (2) in the event it is found liable, there should be set off against National Surety's liability the profit of $59,436.55 which Rauscher, Pierce made on the sale of the bonds to the Water Bond Purchasers.

We first consider National Surety's contention that the suits by the Water Bond Purchasers did not come within the coverage of the bond. The alternatives for supporting this position are few. National Surety must show either (1) that the suits instituted by the Water Bond Purchasers did not grow out of alleged fraudulent acts committed by the employees of Rauscher, Pierce, the Assured, or (2) that no loss was in fact sustained by Rauscher, Pierce.

■■ We easily dispose of the first. It is clear from the face of the complaints filed by the Water Bond Purchasers that the alleged misconduct was sufficient to bring the suit within coverage of the indemnity bond.[3] Actually

---

3. The complaint filed by one of them shows:
    "5. In connection with the offering to and purchase by plaintiff of these bonds from defendant, defendant caused to be delivered to plaintiff through the United States mails a letter from one Edward T. Volz, its then Manager, Institutional and Dealer Sales, dated February 2, 1957, with which were enclosed and transmitted a circular describing said bonds and their issuer and a letter report of Cameron Engineering Company on said bonds and district issuing them dated 18 January, 1957, signed by one Homer Trimble as a registered professional engineer; and in addition made and caused to be made various other representations of fact, oral and written, regarding said bonds prior to their purchase by plaintiff.
    "7. The said Edward T. Volz was at that time and at all times material hereto an agent and employee of defendant. In forwarding the aforesaid matter to plaintiff through said mails he was act-

National Surety does not deny that the demand of the Water Bond Purchasers was based on alleged misrepresentations by Volz acting in his official capacity as representative of Rauscher, Pierce. Rather, as near as we can discern it, National Surety contends that the claims were not within the coverage because Rauscher, Pierce was in a position to avoid the prosecution of the suits without actually sustaining any loss. In their suits the Water Bond Purchasers demanded a rescission of the sale. In exchange for the full purchase price paid for the bonds, they tendered a return of the bonds together with all interest received thereon to date.[4] For reasons

it fully explained, Rauscher, Pierce rejected the offer to rescind as not being a prudent disposition of the claims. National Surety argues that by rejecting the offer to rescind, Rauscher, Pierce eliminated any possible liability under the indemnity bond. The reasoning runs this way. Since Rauscher, Pierce could have rescinded the sale, this would have restored the status to the position existing prior to making of the sale. Rauscher, Pierce would have had the bonds, it would have given up the proceeds received on the sale by returning the purchase price to the Water Bond Purchasers. Thus everyone would be where they were earlier, and no loss would have

---

ing within the scope of his authority as Manager, Institutional and Dealer Sales of defendant.

"*   *   *

"12. Each and every statement and representation referred to in paragraphs 5, 8, 9 and 10 above was made for the purpose of inducing plaintiff to purchase the bonds and plaintiff was entitled to rely upon each such statement and did so to its damage in making such purchase.

"*   *   *

"15. The representations and statements made by defendant and referred to in paragraphs 5, 8, 9 and 10 were each untrue. Each was a misrepresentation of a material fact, made by defendant in the mistaken belief that it was true and made with the intent that plaintiff should believe it and rely upon it in deciding whether or not to purchase the bonds. Plaintiff did believe and rely upon each such misrepresentation, and each was a material factor in its decision to purchase the bonds. Plaintiff and defendant were mutually mistaken about the truth of each such representation and statement. Had plaintiff known the true state facts as to any of these misrepresented matters it would not have purchased the bonds. *   *   *.

"16. Each statement and misrepresentation referred to in paragraphs 5, 8, 9 and 10 was made by defendant with reckless disregard of its truth or falsity and as to the omission of relevant material facts in connection therewith, with the intent that plaintiff should believe it and rely upon it in deciding whether or not to purchase the bonds. Plaintiff did believe and rely upon each such misrepresentation, and each was a material

factor in its decision to purchase the bonds. Had plaintiff known the true state of facts and to any of these misrepresented matters it would not have purchased the bonds. *   *   *.

"17. Each statement and misrepresentation referred to in paragraphs 5, 8, 9 and 10 was made by defendant when said defendant knew or should in the exercise of reasonable care have known it to be false and misleading as therein stated, and with the intent that plaintiff should believe it and rely upon it in deciding whether or not to purchase the bonds. Plaintiff did believe and rely upon each such misrepresentation, and each was a material factor in its decision to purchase the bonds. Had plaintiff known the true state of facts as to any of these misrepresented matters it would not have purchased the bonds. *   *   *."

The complaint filed by the other purchaser was substantially the same.

4. The complaint filed by Connecticut Mutual Life stated:

"18. Plaintiff has heretofore claimed against defendant rescission of the sale of these bonds to it and offered physical tender to defendant of said bonds together with all interest received thereon. *   *   *

"Plaintiff *   *   * has been, and is now ready, willing and able to pay over and deliver to defendant said bonds and all interest received thereon by it; and plaintiff hereby makes its continuing tender and offer to do so and to do such all other equity as may be appropriate."

The complaint filed by the other was similar.

been sustained by anyone. Countering this argument Rauscher, Pierce made out several strong points. The first is that in early stages of the litigation, there was reasonable expectation that a meritorious defense of laches could be made out. Additionally, had the suit gone to trial, there was the great possibility that under F.R.Civ.P. 54(c) the trial Court might award damages to the Water Bond Purchasers rather than merely grant the rescission. Travelers Ins. Co. v. Busy Elec. Co., 5 Cir., 1961, 294 F.2d 139. National Surety responds by asserting that these contentions were relevant only had the suits proceeded to trial. Since trial was avoided by compromise, this means in effect that Rauscher, Pierce lost all coverage since by exercising the proffered (but rejected) rescission, all "loss" could have been avoided. But we think this argument is without merit. This puts the Assured in the position of choosing at its peril between taking the safe way out by returning to the pre-sale status or simply relinquishing its coverage under the indemnity bond by insisting in good faith on its right to defend the suit. After all, to accept without hesitation the proffered rescission would be to concede liability, to concede the total absence of a defense, either complete or partial. But with coverage denied and the demand for defense rejected, the standard was one of taking that action which a prudent uninsured security dealer would have taken. That course might lead to defense to the bitter end or defense for awhile and compromise as the exigencies suggested. United Services Auto Assn. v. Russom, 5 Cir., 1957, 241 F.2d 296, n. 9 and related text. On the merits the investigation at least for a long time indicated that Rauscher, Pierce might be able to reduce the loss considerably if damages, not rescission, were awarded. What made rescission so unattractive—both to the Assured and ultimately to the Insurer, was the great drop in market value of the bonds (about 60) in 1961 in contrast to 1957. At any rate, Rauscher, Pierce invited National Surety to take over settlement negotiations and to pass on proposed alternative settlements. But this, too, was met with a refusal. The wisdom and the prudence of the settlement simply is not challenged.

National Surety urges that as the sale of the bonds was made by Rauscher, Pierce acting as principal to allow recovery for damages after rejecting rescission would be to allow the principal to recover the fruits of its own fraudulent acts. This, it claims, would be against public policy. Rauscher, Pierce does not deny that it made the sale acting as principal, but it makes the undeniable response that it was placed in this situation because of the fradulent misrepresentations made by Volz. Although the transaction had three steps, the record bears out, and the Court impliedly found, that no commitment to purchase the bonds from Tucker was made by Rauscher, Pierce until it had a firm commitment for resale to the Water Bond Purchasers. The theory is, then, that the false information furnished by Volz was a fraudulent misrepresentation to them as much as to the Water Bond Purchasers. Consequently, the argument runs, since Rauscher, Pierce relied on Volz throughout the transaction and its liability to the Water Bond Purchasers was brought about by no illegal acts of its own, public policy is not offended by allowing it to recover for damages it sustained as principal because of fraudulent acts of its agent. Hendrix v. Employers Mut. Liability Ins. Co., E.D.S.C.1951, 98 F.Supp. 84.

In assaying this, we think National Surety is wrong in asserting that this theory that the Assured was itself defrauded by Volz was not before the Court or passed on by it. First, the proof was directed pointedly this way. And it was quite ample. Next, it matters not that the amendment to Par. 7 of the Complaint was after the demand to defend the suits by the Water Bond Purchasers. National Surety overlooks a material fact. Although that might have a bearing on whether attorney fees were recoverable for defending that suit, the

Assured's claim is not for defense alone. The bond indemnifies them from loss sustained by it (see note 1, supra). That loss might be a direct one, e. g., from theft, embezzlement, etc., or because of liability to third persons. Here it showed it sustained a loss because it, too, was defrauded by the agent.

■ Of course, as to the claims by the Water Bond Purchasers, these fit the literal terms of the coverage (see note 1, supra). The duty to defend, of course, is ordinarily fixed by the allegations of the damage complaint. Green v. Aetna Ins. Co., 5 Cir., 1965, 349 F.2d 919.

National Surety next asserts that if it is liable under any circumstances it should be liable only to the extent the damages exceed the profits Rauscher, Pierce made on the sale of the bonds to the Water Bond Purchasers. To this Rauscher, Pierce makes several responses including procedural ones we ignore.

■ Rather, we think we should face up to the merits of whether the "loss of the bargain" sustained by Rauscher, Pierce is a damage which should come within the coverage of the indemnity bond. A reading, cursory or close, of the language in the indemnity bond reveals no limitations on the type or amount of losses covered. All that is required is that such loss is due to the " * * * dishonest, fraudulent or criminal act of any of the employees, * * *."

■ At the outset we start with the Texas rule that doubts in construction of the bond must be resolved against the surety. Fidelity and Deposit Co. of Maryland v. Central State Bank, Tex. Civ.App.1928, 12 S.W.2d 611, 613; Massachusetts Bonding & Ins. Co. v. Texas Finance Corp., Tex.Civ.App.1924, 258 S.W. 250, error dismissed; First State Bank v. Metropolitan Casualty Ins. Co., 1935, 125 Tex. 113, 79 S.W.2d 835, 98 A.L.R. 1256.

But we see no doubt and no reason to import doubt. We look on this as do the businessmen to this contract. On the one hand is a stock broker who runs the risk that its assets will be lost, squandered, or dissipated through unfaithfulness of its servants. On the other, is a surety company desperately trying to interest such businesses to insure against losses by purchasing protection from it at a premium which will—it hopes— assure it a profit. The businessman is in the business to make money—make profits. When he loses assets, he loses what profits, current or past, have produced. The loss is the loss of assets— generally money—not the origin of such money. The loss is as real in nature and amount as that sustained when a third party recovers judgment for a fraudulent or dishonest act of an employee.

This Court held as much in Eagle Indemnity Co. v. Cherry, 5 Cir., 1950, 182 F.2d 298. In that case the indemnity bond was much like the present one. The indemnity bond insured against " * * * Any loss of money or other property * * * which the insured shall sustain * * * through * * * fraudulent or dishonest act or acts committed by any one or more of the employees * * *." There the president of the company using his position of trust secretly purchased steel and resold it pocketing the profits without the transaction ever going through the company. We allowed the recovery of the profits from the indemnity company.

. We regard Penn National Hardware Mutual v. General Finance Corp., 5 Cir., 1926, 16 F.2d 36, pressed so heavily by National Surety, as clearly distinguishable. In *Penn National*, the assured was in the business of financing the sale of automobiles and the indemnity agreement was to indemnify the assured against any loss sustained due to default on the mortgages by the mortgagor. It was not to indemnify against losses due to fraudulent or dishonest acts of the employees. In this pre-Erie case we merely construed that contract in saying, "[t]he policy did not insure against the loss of profits * * *." The nature and range of the risks, almost unlimited in scope and potential amount (subject to the bond ceiling of $500,000) make

the contract here of quite a different nature. Nor are we able to see how National Surety can get any comfort from In re: Schluter, Green & Co., 4 Cir., 1938, 93 F.2d 810. It did not present our problem. And except to say that Kramer v. Linz, Tex.Civ.App.1934, 73 S.W.2d 648, is easily distinguishable, it deserves no further comment.

The faithless employee committed fraudulent acts. It involved the Assured in serious charges since, although morally innocent, it was nevertheless accountable to others for actions of its servants. To settle the claim it had, or will have, to give up much that it would have kept. These were losses.

The occurrence was covered. So, too, were the losses. It is that much worse off than it would have been had not the servant fraudulently misled it and the customer. That was the risk underwritten. It is the one to be reimbursed.

Affirmed.

RIVES, Circuit Judge (dissenting).

The majority points out that: "Although the transaction had three steps, the record bears out, and the Court impliedly found, that no commitment to purchase the bonds from Tucker was made by Rauscher, Pierce until it had a firm commitment for resale to the Water Bond Purchasers. The theory is, then, that the false information furnished by Volz was a fraudulent misrepresentation to them as much as to the Water Bond Purchasers."

Arnold J. Kocurek, Senior Vice President and Director of Rauscher, Pierce, testified:

"Q. Under that calculation from your books can you also say what profit net, after all deductions and payment of commissions and expenses Rauscher, Pierce made in connection with the purchase of the bond issue from Tucker, and the sales to Connecticut Mutual and State Mutual?

"A. The figure is $59,436.55. That is before overhead.

"Q. Now, the net figure not including overhead, was what per cent?

"A. It was 4 per cent of the par value of the bonds."

It seems clear to me that the loss of Rauscher, Pierce under the bond should be computed from the transaction as one integrated whole. I therefore respectfully dissent from the judgment of affirmance.