**HS EQUITIES, INC., Plaintiff-Appellee,**

v.

**HARTFORD ACCIDENT & INDEMNITY COMPANY, Defendant-Appellant and Third-Party Plaintiff,**

v.

**Marvin MICHAEL, Third-Party Defendant.**

**No. 943, Docket 79-7082.**

United States Court of Appeals, Second Circuit.

Argued May 18, 1979.

Decided Nov. 19, 1979.

Robert G. Desmond, Wien Lane & Malkin, New York City (Seward & Kissel, New York City, Kenneth J. Kelly, New York City, of counsel), for plaintiff-appellee.

Thomas R. Pattison, New York City (Bigham, Englar, Jones & Houston, New York City, Alfred J. Morgan, Jr., New York City, of counsel), for defendant-appellant and third-party plaintiff.

Before WATERMAN and MESKILL, Circuit Judges, and WYATT, District Judge.*

WATERMAN, Circuit Judge:

Defendant-appellant Hartford Accident & Indemnity Company (Hartford) appeals from an Order and Judgment entered December 28, 1978 after a bench trial before the United States District Court for the Southern District of New York (Broderick, District Judge)[1] granting judgment in favor of plaintiff-appellee H.S. Equities, Inc., formerly known as Hayden, Stone Inc. (HS), a broker-dealer registered as such with the Securities and Exchange Commission. HS was awarded a total of $228,806.13[2] plus costs. We find no reversible error in the decision below, and affirm the judgment of the district judge.

The present case is an outgrowth of an earlier action, commenced on December 10, 1969 by two customers (the Odesseys) of HS. In this earlier suit (the Odessey action), the Odesseys sued both HS and one Marvin Michael (Michael), an HS employee and registered representative in charge of the Odesseys' accounts, principally alleging violations of the antifraud provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934. Specifically, the Odesseys charged that Michael had churned their accounts, had purchased and sold securities for their accounts without their authorization, had fraudulently misrepresented to them that he would take certain actions and had maliciously breached his fiduciary duties to them. Subsequently their complaint was amended to allege similar violations of the Commodity Exchange Act arising out of Michael's handling of the Odesseys' commodity accounts and to allege common law fraud. The Odesseys sought $750,000 in actual damages and an unspecified amount of punitive damages.

Well prior to the commencement of the Odessey action, on October 29, 1967, Hartford issued Brokers Blanket Bond No. 3800438 to HS. The terms of this Bond provided, in pertinent part:

The losses covered by this Bond are as follows:

Fidelity

(A) Any loss through any dishonest, fraudulent or criminal act of any of the Employees, committed anywhere and whether committed alone or in collusion with others, including loss of Property through any such act of any of the Employees.

. . . . . . .

Court Costs and Attorneys' Fees . . .

[Hartford] will indemnify the Insured against court costs and reasonable attorneys' fees incurred and paid by the Insured in defending any suit or legal proceeding brought against the Insured to enforce the Insured's liability or alleged liability on account of any loss, claim or damage which, if established against the Insured, would constitute a valid and collectible loss sustained by the Insured under the terms of this bond. Such indemnity shall be in addition to the amount of this bond. In consideration of such indemnity, the Insured shall promptly give notice to [Hartford] of the institution of any such suit or legal proceeding; at the request of [Hartford] shall furnish it with copies of all pleadings and other papers therein; and at [Hartford's] election shall permit [Hartford] to conduct the defense of such suit or legal proceeding, in the Insured's name, through attorneys of [Hartford's] own selection.

HS retained outside counsel to defend itself in the Odessey action, and Michael retained separate counsel. HS believed the

---

* Honorable Inzer B. Wyatt, District Judge of the United States District Court for the Southern District of New York, sitting by designation.

1. *H.S. Equities, Inc. v. Hartford Accident & Indemnity Co.*, 464 F.Supp. 83 (S.D.N.Y.1978).

2. The court arrived at this total award by combining HS's costs of settling the claim made against it ($123,828.75) plus interest on that sum ($42,746.33) with the attorneys' fees incurred and disbursements made by HS in defending against that claim ($47,343.25) plus interest on that sum ($14,887.80).

Odessey action to be covered under the terms of the Fidelity clause, and in conformance with the requirements of the Attorneys' Fees clause notified Hartford in early 1970 of the commencement of the Odessey action and sent Hartford copies of the pleadings. However, Hartford, exercising its right of election under the Attorneys' Fees clause of the Bond, chose not to assume the defense of the Odessey action.

At about this same time in early 1970, HS became aware, primarily through conversations with its insurance broker (Annucci), who had been in contact with a representative of Hartford (Duffy), that Hartford did not regard churning as dishonesty within the meaning of the Fidelity clause of the Bond, and further, that Hartford regarded that clause as only covering dishonesty by an employee directed toward his employer, not dishonesty by an employee directed toward a third party, such as a customer.[3]

The next significant development in the Odessey action occurred early in 1973, when HS advised Hartford that settlement of the Odessey action was being discussed. Shortly thereafter, on January 15, 1973, HS and Michael settled the lawsuit without obtaining the prior approval of Hartford. The settlement agreement provided that HS was to pay the Odesseys $122,000 plus interest of $1,828.75, and that Michael was to pay the Odesseys $40,000 from his personal funds. In addition, the settlement agreement provided that all parties to the action were to execute and exchange releases waiving any future claims the parties might assert against each other relating to the original cause of action. On January 30, 1973, HS notified Hartford by letter that the Odessey action had been settled, and requested that Hartford pay HS's portion of the settlement. Hartford declined cover-

age and notified HS of its decision by a letter dated March 14, 1973.[4] HS later advised Hartford that it also intended to seek recovery from Hartford of the legal fees ($45,618.25) and expenses ($1,725.00) it had incurred in the defense of the Odessey action. On September 17, 1973, Hartford declined to make payment under the Bond for these fees and expenses.

As a result, HS commenced, in the U.S. District Court for the Southern District of New York, the present action against Hartford in November 1974 to enforce Hartford's alleged liability under the Bond. Hartford answered HS's complaint and also filed a third party complaint against Michael. Michael answered the third party complaint and counterclaimed against Hartford for malicious prosecution. All three parties then moved for summary judgment on the claims that had been brought against them. In an opinion filed November 10, 1976, the district court (Metzner, District Judge) granted Michael's motion on the ground that HS had executed a release in 1973 absolving him of all further liability in connection with the Odessey case. The district court also dismissed Michael's counterclaim against Hartford and denied the remaining motions of HS and Hartford seeking summary judgment. Without limiting the issues to be determined subsequently at trial, the district court held that the principal issue for the trier of fact was whether Hartford had denied liability before HS settled the Odessey action. The district court also held that regardless of whether the specific churning activity the Odesseys alleged in their action was covered under the terms of the Bond, Hartford's general claim that the Bond did not cover the dishonest acts of an employee that were directed toward a third party, such as a customer, was

---

3. At some later point in time, Hartford advanced yet a third rationale for excluding churning claims from the coverage of its Bond: that the profits broker-dealers realized as a result of commissions paid on transactions involving churned accounts could exceed any damage award or settlement subsequently paid to the injured customer, so that in net effect, the challenged conduct produced a gain rather than a loss. See note 4 infra.

4. Apparently Hartford temporarily abandoned reliance on its previously expressed justifications for denying coverage under the Bond, see text at note 3 supra, for its March 14 letter advances the excess of commissions earned on the Odesseys' accounts over the losses sustained in settling the action as the sole reason for Hartford's denial of coverage.

without merit. Finally, the district court held that Hartford was not entitled to have any portion of the profits HS received that had been generated from commissions paid on transactions involving the Odesseys' accounts applied as a set-off to reduce HS's claimed loss on the settlement of the Odessey action.

In the amended pre-trial order entered by the district court below, the parties stipulated that prior to the settlement of the Odessey action, Hartford had informed HS that generally it did not consider actions brought by customers against insured broker-dealers alleging securities laws violations to be within the coverage of the Fidelity clause of the Bond, that HS settled the Odessey action on advice of counsel and in good faith, that the release absolving Michael from further liability in the matter was a part of the settlement agreement and also was executed by HS in good faith, and that the attorneys' fees incurred and disbursements made in connection with HS's defense of the Odessey action were reasonable in amount.

On November 22, 1978, after the conclusion of the bench trial held before the district court on March 23, 1977, Judge Broderick filed his opinion, in which he held that Hartford had denied liability under the Bond for any loss that HS might incur in connection with the Odessey action; that this denial of liability had occurred prior to the settlement of the Odessey action and HS's execution of the release absolving Michael from further liability in connection with that matter; that the allegations of misconduct contained in the Odesseys' complaint, if proved, would have brought that suit within the coverage of the Fidelity clause of the Bond; and that the Odesseys' complaint set forth claims that, if established, would have constituted a valid and collectible loss within the expressed purposes of the Attorneys' Fees clause of the Bond. Accordingly, Judge Broderick found that HS was entitled, under the terms of the Bond, to recover from Hartford all sums expended by HS in defending and settling the Odessey action. Finally, Judge Broderick agreed with Judge Metzner's holding that Hartford was not entitled to apply any portion of the profits generated from commissions paid on transactions involving the Odesseys' accounts as a set-off against the award granted to HS.

On this appeal, Hartford contends that the decision below was erroneous, but now it does not dispute that the churning activity alleged in the Odessey action is a dishonest or fraudulent act covered by the Fidelity clause of the Bond, or that that clause's coverage excludes dishonest or fraudulent acts by an employee directed toward third parties, such as customers. Rather, Hartford advances three other grounds in support of its claim.

First, Hartford maintains that the district court's finding that Hartford denied liability under the Bond prior to HS's release of Michael as part of the settlement of the Odessey action is not supported by the evidence. As Hartford correctly asserts, HS, by releasing Michael, impaired any rights that Hartford would have, as subrogee of HS, to recover from Michael payments made by Hartford to HS under the Bond. If this action by HS prejudiced Hartford's otherwise enforceable rights, then Hartford would be relieved of any obligation to make payments to HS under the Bond. *See Aetna Casualty & Surety Co. v. Phoenix National Bank & Trust Co.,* 285 U.S. 209, 214–16, 52 S.Ct. 329, 76 L.Ed. 709 (1932); *Virginia Metal Products Corp. v. Hartford Accident & Indemnity Co.,* 219 F.2d 931, 933 (2d Cir. 1955). If, however, it was determined that Hartford had denied liability under the Bond prior to HS's release of Michael, then such action by HS would not prevent HS from subsequently proceeding against Hartford to establish Hartford's liability under the Bond. *See Bunge Corp. v. London and Overseas Insurance Co.,* 394 F.2d 496, 497 (2d Cir.), *cert. denied,* 393 U.S. 952, 89 S.Ct. 376, 21 L.Ed.2d 363 (1968).

We do not agree with appellant that the finding of the district court below that Hartford had denied liability under the Bond prior to HS's settlement of the Odes-

sey action and release of Michael was clearly erroneous. We find ample support for this finding in the evidence. As previously noted, the parties stipulated in the amended pre-trial order that Hartford had informed HS, prior to the settlement of the Odessey action, of its general position regarding suits covered by its Bond, *i. e.*, that suits brought by customers against insured broker-dealers alleging securities laws violations were not within the coverage of the Fidelity clause of the Bond.

Arguably, because Hartford had expressed only a "general" position and had not mentioned the Odessey action by name, Hartford's pre-settlement statements could not be interpreted as a specific denial of liability in the Odessey suit. However, HS was aware not only of Hartford's "general" position, but also of the varied justifications Hartford had advanced for that position— that Hartford did not regard churning as a dishonest or fraudulent act, that dishonesty or fraud of an employee directed toward customers was not covered by the Fidelity clause, and that HS might have realized from the commissions paid on past transactions involving the Odesseys' accounts profits in excess of the amount HS paid to the Odesseys in settlement, so that, technically, the challenged conduct might have resulted in a net gain to HS, rather than a loss to it.

When HS assessed Hartford's general position and the alternative lines of reasoning advanced in support of it, HS was justified in concluding that there was no reasonable possibility that there might not be an application of this general position to the particular factual situation presented by the Odessey action. Accordingly, we agree with the finding of the district court below

that Hartford's pre-settlement expression of its general position was the equivalent of a denial of liability in the Odessey action.

Next, Hartford contends that the district court below erred in rejecting Hartford's argument that profits generated from commissions paid on transactions involving the Odesseys' accounts should be applied as a set-off against the award granted to HS.[5] Here Hartford concedes that the relevant case law is contrary to the position it proposes, *see National Surety Corp. v. Rauscher, Pierce & Co.*, 369 F.2d 572, 578–79 (5th Cir. 1966), *cert. denied*, 386 U.S. 1018, 87 S.Ct. 1375, 18 L.Ed.2d 456 (1967), but it suggests that this case presents a compelling opportunity to reverse this trend in the case law, and invites this Court to take such action. We decline to accept Hartford's invitation.

Although serious public policy considerations might counsel the adoption of such an approach if there were insufficient deterrents against the challenged conduct involved in the Odessey action, that situation is not presented here. As HS correctly points out, serious consequences attaching to SEC disciplinary proceedings certainly discourage broker-dealers from countenancing conduct by their employees that violates the securities laws. Hartford's addition of a set-off clause to its Bond might well provide an additional deterrent against conduct violative of the securities laws, but it is clear that no such clause is included in the Bond Hartford issued to HS. Therefore, in accordance with the general rule that the words used in an insurance contract are to be given their normal meaning absent a clear showing of contrary inten-

---

5. Hartford insists that the court below misconstrued its set-off argument, as it intended that only net profits, not gross commissions, should be applied as a set-off to reduce HS's claimed losses in settling the Odessey action, and further, that only those profits attributable to the churning transactions involving the Odesseys' accounts, as distinguished from profits attributable to any past transactions involving the Odesseys' accounts, should be included in the amount of the set-off. We are of the opinion that the court below was not operating under a

misconception as to the true nature and extent of Hartford's set-off argument when it was rejected. In any event, we hold that even if the court below did regard Hartford's set-off argument as requiring an aggregation of all gross commissions earned on all past transactions involving the Odesseys' accounts, that court's rejection of Hartford's set-off argument remains a correct decision when looked at in the light of the set-off argument as limited and described by Hartford before this Court.

tion,[6] and because we consider the public policy against encouraging violations of the securities laws to be amply protected by comprehensive federal legislation, we hold that the district court did not commit error in refusing to imply any set-off provision in the Bond Hartford issued to HS.

■ Finally, Hartford insists that it cannot be held liable to HS for amounts paid by HS in settlement of the Odessey action because the allegations raised in the Odesseys' complaint never were proved. Basically, Hartford's position is that it cannot be compelled to make any payment to HS under the terms of the Bond unless and until Michael has been proved to be guilty of the securities laws violations alleged in the Odesseys' complaint, and that it was error for the district court to order Hartford to make such payment to HS in light of an explicit admission by the court that the truth of the allegations against Michael contained in the Odesseys' complaint had not been established in any court proceeding.[7] Although Hartford's argument may have some merit if raised in a more receptive setting, here Hartford has overstated its case, and we hold that this aspect of the district court's decision contains no reversible error.

In rejecting Hartford's arguments on this matter, we first note that Hartford was afforded the opportunity to assume the defense of the Odessey action, which Hartford, pursuant to its right of election, declined to do. Moreover, the district court found—and we agree with the finding—that Hartford had denied its liability under the Bond prior to HS's settlement of the Odessey suit. Certainly, we do not suggest that Hartford, as punishment for exercising a valid contractual right or for adopting what subsequently was found to be an incorrect position regarding the coverage of its Bond, should be precluded from denying its liability under the Bond in this case if Michael were innocent of the charges brought against him. Moreover, we do not wish to be understood as holding that Michael's innocence, or lack of it, is irrelevant to the issue of whether Hartford was liable under the Bond to HS.

We do note, however, that certain consequences attached to Hartford's decisions to decline to assume the defense of the Odessey action and to deny liability under the Bond. One of these consequences, which we believe to be dispositive here, is that the burden was placed on Hartford to successfully contest matters which otherwise are presumed to have been established in the litigation against HS.[8] HS was entitled to

---

**6.** *See Aschenbrenner v. United States Fidelity & Guaranty Co.*, 292 U.S. 80, 85, 54 S.Ct. 590, 78 L.Ed. 1137 (1934). In this connection, we agree with the interpretation given by the Fifth Circuit to nearly identical language in a case analogous to the present one: "To settle the claim [the broker-dealer] had, or will have, to give up much that it would have kept. These were losses." *National Surety Corp. v. Rauscher, Pierce & Co.*, 369 F.2d 572, 579 (5th Cir. 1966), *cert. denied*, 386 U.S. 1018, 87 S.Ct. 1375, 18 L.Ed.2d 456 (1967).

**7.** The court below explicitly stated:

Since the Odessey action was settled prior to trial, there has, of course, been no finding by any court or jury that the allegations of the Odessey suit were true. Nor has there been any finding in this action that those allegations are true.

*H.S. Equities, supra* note 1, 464 F.Supp. at 87 n.6.

**8.** In describing the relation between the settlement of the Odessey action and Hartford's liability to HS under the Bond, the district court

quoted the following language from *Feuer v. Menkes Feuer, Inc.*, 8 A.D.2d 294, 299, 187 N.Y.S.2d 116, 121 (1st Dep't 1959):

If . . . the indemnitor declines to defend the proceeding, and the indemnitee is therefore required to carry that burden, then the indemnitor is conclusively bound by any reasonable good faith settlement the indemnitee may make or any litigated judgment that may be rendered against him [citations omitted].

*H.S. Equities, supra* note 1, 464 F.Supp. at 87.

As the court below noted, however, the passage from *Menkes Feuer* is dictum, and we believe it overstated the binding effect on an indemnitor of even the most reasonable good faith settlement entered into by an indemnitee. We believe that a more accurate statement of the law is contained in *Conner v. Reeves*, 103 N.Y. 527, 9 N.E. 439 (1886), a case dealing with the analogous issue of the binding effect on a surety of a consent judgment entered against its insured: "[T]he reasonable rule is that a judgment so obtained [*i. e.*, by consent of the parties to the action rather than by a decision

advance the fact of its settlement of the Odessey action as presumptive evidence of the conclusion that Michael had committed the actions alleged in the Odesseys' complaint. Once HS had done this, Hartford was obliged to show either bad faith, fraud, or factual or legal error to rebut this presumptive evidence. Because Hartford did not even attempt to make such a showing, it must be bound by the natural inference of the settlement, *i. e.*, that Michael had committed the actions alleged in the Odesseys' complaint.[9] Thus, while the district court was literally correct in stating that the truth of the allegations contained in the Odesseys' complaint never had been established in a court proceeding, the court's statement should not be interpreted as dispensing with a requirement that HS, as indemnitee, needed to produce proof of liability on the underlying claim before being entitled to recover from its indemnitor, Hartford, on the basis of that underlying claim. Rather, the court's statement should be interpreted as conveying no more than the obvious, that because the underlying Odessey action was settled before reaching judgment on the merits, and because HS advanced that settlement as presumptive evidence of Michael's guilt in the Odessey action, which presumption never was rebut-

ted in the later proceedings involving HS and Hartford, it was unnecessary for the court to determine whether the allegations originally contained in the Odesseys' complaint were true.

The judgment of the district court is affirmed.

---

on the merits] is presumptive evidence only against the sureties, and that they are at liberty to show that it was not founded upon any legal liability to the plaintiff in the action, or exceed[s] such liability." *Id.* at 532, 9 N.E. at 442. *See also Gray Manufacturing Co. v. Pathe Industries, Inc.*, 33 A.D.2d 739, 305 N.Y.S.2d 794 (1st Dep't 1969), *aff'd*, 26 N.Y.2d 1045, 312 N.Y.S.2d 200, 260 N.E.2d 821 (1970).

9. In the proceedings below Hartford never advanced Michael's innocence in the underlying Odessey action as a defense to its liability to HS under the Bond. Although Hartford did allege that Michael had committed no dishonest or fraudulent acts, and that HS had sustained no loss within the coverage of the Bond, an examination of the record reveals that such allegations were based on Hartford's theories that churning was not a dishonest or fraudulent act, that Michael's conduct was not dishonest or fraudulent vis-a-vis his employer, and that the challenged course of conduct had produced a net gain to HS. These allegations were not based on the claim that Michael did not commit the acts set forth in the Odesseys' complaint, a

claim that Hartford raises for the first time on this appeal. Whatever motivated Hartford to eschew reliance on this theory in the district court proceedings (perhaps Hartford, upon receiving an initial memo from its legal counsel detailing the $29,000,000.00 in trading over a five year period on the Odesseys' equity investment of $330,000, and a later memo containing a statement that "evidence of the volume of trading over a certain period of time may present a prima facie case for churning" determined that reliance on such a theory would be futile), we see no justification here to depart from our general rule foreclosing appellate consideration of issues not raised in the trial court. *See, e. g., Terkildsen v. Waters*, 481 F.2d 201, 204–05 (2d Cir. 1973).

