**FOOTE, CONE AND BELDING COMMUNICATIONS, INC., Plaintiff,**

v.

**FEDERAL INSURANCE COMPANY, Defendant.**

No. 89 C 5022.

United States District Court, N.D. Illinois, E.D.

Oct. 24, 1990.

---

Holly A. Harrison, R. Quincy White, Eugene A. Schoon, and Gloria R. Mitka, Sidley & Austin, Chicago, Ill., for plaintiff.

Donald L. Mrozek, James D. Harbert, and Daniel K. Ryan, Hinshaw, Culbertson, Moelmann, Hoban & Fuller, Chicago, Ill., for defendant.

## ORDER

NORGLE, District Judge.

Before the court is defendant Federal Insurance Company's ("Federal") motion for summary judgment. For the reasons discussed below, the motion is denied.

## FACTS

In 1972, plaintiff Foote, Cone and Belding Communications, Inc. ("FCB"), a corporate holding company for a number of marketing communications firms, hired James T. Arnold ("Arnold") to work as a field representative in one of its advertising offices. Before his employment with FCB, Arnold held a similar position at another advertising agency, Clinton E. Frank Company ("Clinton Frank"). Arnold was fired from Clinton Frank for embezzling $69,576.50 from a client account. To accomplish the embezzlement, Arnold had created a fictitious business to which he signed over company checks under the guise of expenses incurred for the client account.

At the time Arnold was hired by FCB, two FCB employees were aware of his prior embezzlement: Louis Scott, an officer and chairman of the executive committee who had authority for hiring Arnold; and Edward Ratcliffe, an account supervisor for FCB who had previously been Arnold's supervisor at Clinton Frank. As a precondition to his employment at FCB, Arnold executed a promissory note in favor of Clinton Frank which states that its purpose is to repay "an indebtedness created by the fraud, embezzlement, misappropriation and defalcation of James Arnold while acting in a fiduciary capacity as an employee of Clinton E. Frank." Before his hiring at FCB, Arnold gave a copy of this promissory note to Scott.

In 1973, Scott spoke with Norman Brown, who had just become general manager of FCB's Los Angeles office. Scott discussed with Brown the status and background of the employees in FCB's Los Angeles office. At that time, Scott told Brown that Arnold had a "problem" with a previous employer.[1] Federal does not assert that Brown was told about the specific nature of this "problem," and the court will not engage in speculation.

In 1978, Scott spoke to Welton Mansfield, Arnold's immediate supervisor and an officer at FCB, and told him that Arnold had a problem with a previous employer. Mansfield claims that he was not given any details regarding the problem but was told to "be alert" and that Arnold had been discharged by his previous employer for cause. Federal does not assert that Mansfield was given the specifics of the "cause," and the court will not engage in speculation.

On January 1, 1981, Scott stepped down as chairman of FCB's executive committee,

---

1. Brown was at that time, or later became, an officer of FCB.

but continued to work for FCB and to report directly to the CEO of the company. Scott did not subsequently hold any office with the company.

On February 25, 1982 FCB obtained from Federal an Executive Risk Policy (the "Policy") which, among other things, provides coverage for losses incurred by FCB as a result of employee theft. According to Paragraph 4.6(B), the Policy excluded coverage for:

> loss caused by an **Employee** if an elected or appointed officer of the Insured possesses knowledge of any act or acts of **Theft**, fraud or dishonesty committed by such **Employee**: (a) in the service of the Insured or otherwise during the term of employment by the Insured, or (2) prior to employment by the Insured provided that such conduct involved **Money, Securities** or other property valued at $10,000 or more.... [Emphasis in original.]

Paragraph 4.16 of the Policy states that:

> For the purposes of this policy and the exclusion contained in paragraph 4.6(b), knowledge by the Insured means knowledge possessed by a partner, director or an elected or appointed officer who is aware of the employment of a person and of that person's prior acts of **Theft**, fraud or dishonesty. [Emphasis in original.]

> At the sole discretion of the Company [Federal], coverage may be extended to any individual upon written application by the Insured and consent given by the Company.

In late December 1986, approximately four years after the insurance policy was obtained, Welton Mansfield became suspicious of Arnold's excessive spending and failure to submit expense reports. Mansfield communicated his concern to his superiors, who began investigating Arnold's account. In a memorandum from Mansfield to Tom Randolph (presumably, one of Mansfield's superiors) dated December 12, 1986, Mansfield listed a number of suspicious facts regarding Arnold, and stated that: "There is simply too much smoke here to ignore, particularly in view of Jim Arnold's past."

In September 1987, Mansfield and Randolph confronted Arnold with some of the evidence uncovered by FCB's investigation. Arnold refused to cooperate with the continuing investigation and resigned shortly thereafter. The investigation ultimately revealed that beginning about eight years after Arnold joined FCB (during the period of August 21, 1980 through July 3, 1987), Arnold had embezzled $918,672.83 from the company through a fictitious corporation which he established for this purpose. Arnold, as Vice President–Management Director at FCB, had approved phony invoices "submitted" by the fictitious corporation and paid these invoices out of FCB funds.

In December 1987, FCB filed a claim with Federal under the Policy for the loss caused by Arnold's embezzlement. Federal refused to pay the claim on the grounds that coverage was excluded under Paragraph 4.6(B) and 4.16 of the Policy because an officer of FCB was aware of Arnold's prior theft from Clinton Frank.

On June 22, 1989, FCB filed this diversity action to recover under the Policy for its loss caused by Arnold's embezzlement. After initial discovery, Federal filed this motion for summary judgment.

## DISCUSSION

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment:

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of material fact exists, the court must view the nonmoving party's evidence as true and draw all justifiable inferences in that par-

ty's favor. *Id.* at 255, 106 S.Ct. at 2513; *see Santiago v. Lane,* 894 F.2d 218, 221 (7th Cir.1990). In ruling on a summary judgment motion, a judge should not weigh the evidence, make determinations of credibility, or draw even "legitimate inferences" in favor of the moving party. *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2513. Further, the court is not permitted to. speculate.

■ The parties agree that most of the terms of the exclusion specified in paragraph 4.6(B) of the Policy are satisfied here. It is undisputed that FCB's loss was "caused by an Employee," and that prior to his employment at FCB, Arnold had committed an "act or acts of theft, fraud or dishonesty" involving "money, securities of other property valued at $10,000 or more." The pivotal issue is whether the undisputed facts establish that an elected or appointed officer of FCB knew of Arnold's prior acts · of dishonesty for the purposes of paragraph 4.6(B).

Drawing all justifiable inferences in favor of FCB, as it must, the court finds that genuine issues of material fact exist regarding whether an officer of FCB had sufficient knowledge of Arnold's past dishonesty to trigger the Policy's 4.6(B) exclusion.

Of the four FCB employees who had any knowledge of Arnold's past, only three— Scott, Brown and Mansfield—were officers.[2] According to the parties' submissions to the court,[3] Brown knew only that Arnold had a "problem" with his previous employer—not that Arnold had committed some prior act or acts of "theft, fraud or dishonesty" involving "money, securities or property valued at $10,000 or more." Sim-

ilarly, the submissions concerning Mansfield establish only that he was told that Arnold had a problem with his previous employer; that Arnold had previously been fired for cause; that he should "be alert" to Arnold; and that his knowledge of Arnold's past caused him to view Arnold's account transactions with suspicion.

The facts, as set forth above, do not establish that Brown or Mansfield knew, for the purposes of paragraph 4.6(B) of the Policy, that Arnold had committed prior acts of dishonesty involving $10,000 or more.[4] Material fact issues exist regarding the extent of Brown and Mansfield's knowledge of Arnold's past. Thus, summary judgment is precluded on this issue.

The only officer who unquestionably had specific knowledge of Arnold's prior acts of dishonesty was Louis Scott. FCB argues, however, that Scott's knowledge of Arnold's past does not invoke the 4.6(B) exclusion because Scott was no longer "an elected or appointed officer" at the time the Policy was obtained.

Federal makes several arguments in an effort to circumvent the fact that Scott was technically not an officer of FCB at any time in which the Policy was in force. First, Federal argues that the term "elected or appointed officer" in 4.6(B) includes individuals who held office before the Policy was obtained, as well as individuals who held office after the Policy took effect. In support of its argument, Federal notes that 4.6(B) does not state "present officer" or "officer at the time of issuance of the policy."

Second, Federal argues that when Scott was an officer, his knowledge of Arnold's defalcation was imputed to the corporation

**2.** Federal has provided no evidence that Edward Ratcliffe, who apparently had full knowledge of Arnold's prior embezzlement, was either an officer of FCB (as required by paragraph 4.6(B) of the Policy), or a "partner" or "director" of the company (as described in paragraph 4.16).

**3.** In support of their factual allegations, both parties have submitted a variety of materials, including transcripts of depositions and sworn statements, as well as affidavits of the various individuals involved here.

**4.** The court notes that Mansfield's testimony— that he, as Arnold's direct supervisor, did not inquire into Arnold's past "problem" after being warned that Arnold had previously been fired for cause and that he should "be alert" to Arnold's activities—stretches credibility. It suggests that Mansfield agreed to be alert to Arnold without any idea of what behavior or actions he was to watch for. Nonetheless, on a motion for summary judgment, the court is not at liberty to weigh the evidence or make determinations of credibility. *See Liberty Lobby,* 477 U.S. at 255, ·106 S.Ct. at 2513.

and, by logical extension, to all other officers of the corporation—some of whom continued to hold office after the Policy was in force. Similarly, Federal asserts that Arnold's promissory note to Clinton Frank, a copy of which was given to Scott, constitutes a corporate record—the knowledge of which also must be imputed to all of FCB's officers. Federal contends that Scott's knowledge, and the information in the promissory note, once imputed to FCB and its officers, remained so éven after Scott stepped down from office.

Federal also argues that even if Scott was not technically an officer when FCB obtained the Policy, he should nevertheless be viewed as an officer for the purposes of 4.6(B) because after the Policy was obtained he continued to work for FCB in an executive capacity in which he reported directly to the CEO of the company. Finally, Federal argues that FCB is estopped from recovering because it concealed Arnold's past dishonesty.

All of Federal's arguments regarding Scott are premised upon Federal's liberal interpretation of the language of 4.6(B). The relevant inquiry regarding Scott, as opposed to Brown and Mansfield, is not "what did he know," but rather, "does his knowledge invoke the 4.6(B) exclusion?" In determining how properly to interpret the language of 4.6(B), the court must look to principles of contract law. Although the parties have not addressed the choice of law issue, the court finds that Illinois law applies.[5]

Under Illinois law: "The question of whether a contract is ambiguous is a conclusion of law and may be reviewed *de novo* by the court on appeal." *LaSalle Nat'l Bank v. Service Merchandise Co.*, 827 F.2d 74, 78 (7th Cir.1987). A contract term is "ambiguous" if it "is subject to more than one reasonable interpretation." *National Fidelity Life Ins. Co. v. Karaganis*, 811 F.2d 357, 361 (7th Cir.1987). Insurance policies, unlike most contracts, are subject to a particularly stringent standard of interpretation.

> [I]f a provision of an insurance policy is ambiguous, the provision must be construed in favor of the insured [citations omitted].... Ambiguous language is strictly construed against the insurance company because the insurer is the drafter of the policy. [Citations omitted.] Thus, the insured's interpretation of an unclear provision must prevail "in order to effectuate 'the predominate purpose of the contract which is to indemnify the insured.' " [Citations omitted.]

*Id.* See also *Heller v. Equitable Life Assur. Soc. of U.S.*, 833 F.2d 1253 (7th Cir. 1987). In *Heller*, the Seventh Circuit stated that: "[I]nsurance policy '[e]xceptions to liability must be expressed in unequivocal language so that it is reasonable to assume the insured understood and accepted these limitations.' " 833 F.2d at 1256, *quoting Garman v. New York Life Insurance Co.*, 501 F.Supp. 51, 52 (N.D.Ill.1980).

The court holds that paragraph 4.6(B) contains ambiguities which must be construed against Federal. Although the language of 4.6(B) is written in clear English prose, it is subject to more than one reasonable interpretation. For example, Federal's argument that 4.6(B) applies to individuals who held office before the Policy was obtained is premised upon its interpretation of the term "elected or appointed officer." However, another reasonable interpretation of this term is that the it applies only to individuals who hold an official office at FCB during the term of the Policy.[6] Federal's failure to articulate precisely the

---

**5.** Where jurisdiction is based on diversity of citizenship (28 U.S.C. § 1332), the federal court must look to the choice of law rules of the state in which it sits to determine which substantive law applies. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under Illinois choice of law principles, contract construction is determined by the law of the place where the contract was made and performed. *Zlotnick v. MacArthur*, 550 F.Supp. 371 (N.D.Ill.1982). Here the place of contract execution and performance appears to be Illinois— FCB's principal place of business.

**6.** This interpretation is supported by the use of the present tense verb "possesses" in the phrase: "if an elected or appointed officer of the Insured possesses knowledge of any act...." If 4.6(B) refers to present possession of knowledge—as the word "possesses" implies—then it is reasonable to infer that it also refers to an individual

scope of this term precludes it from benefitting from the broad definition it now asserts. The court therefore construes language of this exclusion narrowly, and holds that 4.6(B) only applies to those officers who held office on or after the signing of the Policy.

 Federal's next argument—that Scott's knowledge was imputed to other FCB corporate officers while Scott was still in office, and that the imputed knowledge remained with these other officers after Scott resigned—also fails. This argument is based upon the premise that the word "knowledge" in 4.6(B) contemplates "imputed knowledge" as well as "actual knowledge." The court holds that the term "knowledge" in 4.6(B) is ambiguous as it may reasonably be interpreted to encompass only actual knowledge, as opposed to imputed or constructive knowledge. This ambiguity also must be construed against Federal. The court therefore holds that the word "knowledge" in paragraph 4.6(B) refers only to actual knowledge.[7]

Similarly, Federal's argument that Scott, though not an actual officer of FCB, was a "de facto" officer after the Policy was signed at best raises another ambiguity (i.e., does "officer" refer only to someone who holds an official title as opposed to an individual who performs duties which are usually reserved for officers?). This ambiguity also must be construed against Federal, which failed to define the word "officer" with sufficient specificity to resolve the question presented here. The court holds that the word "officer" in paragraph 4.6(B) refers only to individuals who hold an official corporate officer position.[8]

Finally, Federal's argument that FCB is estopped from recovering under the Policy because it "concealed" Arnold's embezzlement from Clinton Frank begs the ques-

tion. FCB could only "conceal" information of which it had knowledge. Whether FCB had "knowledge" of Arnold's prior embezzlement is a question of fact insofar as this knowledge is based upon information known to Brown or Mansfield. As held above, information known to Scott may not be imputed to FCB, because the "knowledge" provision of 4.6(B) must be construed strictly against Federal.

## CONCLUSION

The court holds that the information concerning Arnold's prior defalcation known to Louis Scott does not exclude insurance coverage under paragraph 4.6(B) of the Executive Risk Policy issued by Federal to FCB. The court further holds that genuine issues of material fact exist regarding whether Norman Brown or Welton Mansfield had sufficient knowledge of Arnold's prior defalcation to invoke the 4.6(B) exclusion. For the above reasons, Federal's motion for summary judgment is denied.

IT IS SO ORDERED.

---

who is "presently" (when the Policy is in force) an officer of FCB.

7. Federal also argues that Brown and Mansfield should be charged with constructive knowledge of Arnold's defalcation because they failed to make reasonable inquiries into Arnold's background after they knew he had some history of problems. However, as discussed above, constructive knowledge, like imputed knowledge, may not be read into the ambiguous "knowl-

edge" requirement of paragraph 4.6(B). Construing this ambiguity against Federal, as it must, the court holds that "constructive knowledge" will not trigger the 4.6(B) exclusion.

8. The court additionally notes that the words "elected or appointed" which precede the word "officer" in 4.6(B) indicate that the parties intended for this phrase only to apply to official corporate officers.