PHYLLIS C. KINZER, a Taxpayer of the City of Chicago, on Behalf of and for the Benefit of the City of Chicago, Plaintiff-Appellee and Cross-Appellant, v. FIDELITY AND DEPOSIT COMPANY OF MARYLAND, Defendant-Appellant and Cross-Appellee (The City of Chicago *et al.*, Defendants).

First District (2nd Division)   No. 1—94—0245

Opinion filed May 16, 1995.—Modified on denial of rehearing June 30, 1995.

McNeela & Griffin, Ltd., of Chicago (Cornelius F. Riordan, Edward P. McNeela, and Mary E. Gardner, of counsel), for appellant.

Robert S. Atkins & Associates, of Chicago (Robert S. Atkins, of counsel), for appellee.

PRESIDING JUSTICE SCARIANO delivered the opinion of the court:

Fidelity and Deposit Company of Maryland (Fidelity) appeals from the grant of partial summary judgment in favor of Phyllis C. Kinzer (Kinzer) holding Fidelity liable under a public employees' bond (the bond), which Fidelity issued to the City of Chicago (the City) in 1977, and from a grant of summary judgment in favor of Kinzer in the amount of $1,075,000, plus prejudgment interest.

Kinzer cross-appeals from the trial court's order which limited Fidelity's liability under the bond to $1,075,000 and adjudicated how the City's "loss" was to be calculated. She also appeals from the denial of both her motion for attorney fees and costs and her motion for sanctions.

Under the bond, the City is covered for the failure of an employee to perform faithfully the duties of his office or to account properly for all monies and property received by virtue of his position. Insuring agreement 4 of the bond provides a primary layer of coverage of up to $25,000 per employee, and insuring agreement 3 provides a secondary layer of coverage over all employees of up to $975,000.

This is the third time we have reviewed this litigation, which arises out of the conduct of several former city officials[1] who, absent prior appropriation by the city council, entered into contracts and incurred expenses relating to various special events which the City sponsored between 1978 and 1983. See *Kinzer v. City of Chicago* (1988), 169 Ill. App. 3d 447, 523 N.E.2d 919, *modified in part & rev'd in part* (1989), 128 Ill. 2d 437, 539 N.E.2d 1216 (hereinafter *Kinzer I*); *Kinzer v. Fidelity & Deposit Co.* (1991), 213 Ill. App. 3d 606, 572 N.E.2d 1151 (hereinafter *Kinzer II*).

A complete recitation of the underlying facts regarding the misconduct of the city officials is contained in the above-cited decisions, and while those facts need not be detailed here, a brief review of the holdings in those prior decisions would be helpful. In *Kinzer I*, this court held that the City and comptroller Grim[2] violated section 8—1—7 of the Illinois Municipal Code (Ill. Rev. Stat. 1985, ch. 24, par. 8—1—7 (now 65 ILCS 5/8—1—7 (West 1992))) by expending money for city-sponsored events through an account designated "Fund 666" without prior appropriation, and that Grim was strictly liable for any resulting loss he caused the City. (*Kinzer I*, 169 Ill. App. 3d at 455-58.) The supreme court affirmed our judgment that the expenditures violated section 8—1—7, but found that the common law public official immunity doctrine exempted Grim from liability as to any loss incurred by the City. (*Kinzer I*, 128 Ill. 2d at 445-46.) On our last review of this litigation, we held that

---

[1]The officials are former mayoral assistant Thomas Geary (Geary) and three former city comptrollers, Raymond Coyne (Coyne), Daniel Grim (Grim), and Anthony Fratto (Fratto).

[2]Two other comptrollers (Coyne and Fratto) were named along with Grim in Kinzer's second amended complaint, but they were not parties to *Kinzer I*.

Fidelity's liability was not predicated on its being a "surety" for Grim, but that its liability was broader in scope. (*Kinzer II*, 213 Ill. App. 3d at 610-11.) The instant appeal treats with the following trial court rulings issued since the previous appeals were decided.

In an order dated November 13, 1991, the trial court granted Kinzer's motion for partial summary judgment on the issue of Fidelity's liability under the bond; Fidelity appeals from this order. On March 18, 1992, it orally ruled that Fidelity's total limit of liability under the bond was $1,075,000, and that the City's loss would be measured in terms of the total expenditures from Fund 666 minus the "revenue actually recovered" by the City in holding the disputed events, *i.e.*, the net loss. Kinzer maintains that these rulings were in error. On February 10, 1993, the court further ruled that the automatic "cancellation upon discovery" provision (the cancellation provision or section 6(a)) of the bond was valid and that the City would not be held to have discovered the misconduct of its officials until August 2, 1982, the date of Kinzer's original complaint. Both Kinzer and Fidelity contend that this ruling was in error.

Thereafter, Kinzer filed her motion for summary judgment contending, by using figures calculated by Fidelity's experts, that net expenditures from Fund 666 exceeded revenues by $1,398,386, and thus she was entitled to $1,075,000, the limit stated in the bond, plus prejudgment interest. Fidelity responded to Kinzer's motion and filed a cross-motion for summary judgment, maintaining, *inter alia*, that genuine issues of material fact existed with respect to the amount of "loss" the City sustained, and it contended specifically that the City had, in fact, received a net gain from Fund 666 expenditures of $801,020 and had discovered the misconduct of its officials no later than December 8, 1980, the date on which the 1979 annual report of the comptroller of the City was presented to the city council, thereby triggering the cancellation provision.

In a memorandum opinion and judgment order dated October 13, 1993, the trial court granted Kinzer's summary judgment motion, and it denied Fidelity's. Subsequently, Kinzer filed a motion under section 155 of the Insurance Code for attorney fees and costs (215 ILCS 5/155 (West 1992)), as well as under Supreme Court Rule 137 for sanctions (134 Ill. 2d R. 137), both of which were denied, along with Fidelity's motion to reconsider the court's summary judgment order, on December 13, 1993. Fidelity filed its notice of appeal on January 12, 1994, and Kinzer filed her notice of cross-appeal on January 14, 1994.

A review of summary judgment orders is *de novo*, and a reviewing court should make an independent determination as to whether

genuine issues of material fact exist with respect to any issue. (*Lavat v. Fruin Colnon Corp.* (1992), 232 Ill. App. 3d 1013, 1023, 597 N.E.2d 888.) The nonmovant is not required to prove his claim or defense at the summary judgment stage but must present some evidence to raise factual disputes regarding one or more elements of that claim or defense. Further, the evidence presented must be construed strictly against the movant and liberally in favor of the nonmovant. *Quality Lighting, Inc. v. Benjamin* (1992), 227 Ill. App. 3d 880, 884, 592 N.E.2d 377; *Gardner v. Navistar International Transportation Corp.* (1991), 213 Ill. App. 3d 242, 250, 571 N.E.2d 1107.

Despite this court's rulings in *Kinzer I* and *II*, Fidelity still claims that the trial court erred in ruling that Fidelity was liable under the bond because: (1) the City exercised its home rule power when it expended the funds at issue, thereby superseding any statutory appropriation requirements, (2) the city council ratified the acts of Grim and the other implicated City officials, and (3) the City's liability is not predicated upon that of Grim or, in the alternative, (4) is co-extensive with that of Grim and therefore may avail itself of the public official immunity doctrine.

We hold each of these contentions to be irredeemably without merit and not in need of any gloss further than that which we have already given them in *Kinzer I* and *II*. *People v. Patterson* (1992), 154 Ill. 2d 414, 468, 610 N.E.2d 16 (courts generally refuse to reopen what has been decided, and "a rule established as controlling in a particular case will continue to be the law, as long as the facts are the same"); *Stallman v. Youngquist* (1987), 152 Ill. App. 3d 683, 689, 504 N.E.2d 920, *rev'd on other grounds* (1988), 125 Ill. 2d 267, 531 N.E.2d 355 (when the evidence on a subsequent appeal is the same or substantially the same as that of a prior appeal, *i.e.*, there is an identity of particular issues, facts and evidence, the adjudications of the prior appeal become the law of the case, and are binding upon that court on a following appeal, regardless of whether the prior decision was right or wrong).

▮ Continuing with its challenge to its liability under the bond, Fidelity asserts that the City officials are not covered by the bond because in failing to execute, as a condition of their office, an "individual bond" they were not "employees" of the City. Ill. Rev. Stat. 1985, ch. 24, par. 3—14—3 (now 65 ILCS 5/3—14—3 (West 1992)).

As Kinzer aptly demonstrates in her brief, this contention is disingenuous for a number of reasons. Fidelity is, of course, bound by its admissions, and this claimed defense to liability, as the trial judge stated, "contradicts [its] longstanding answers to [Kinzer's] interrogatories." It admitted that the bond was the only such bond that covered

the comptroller defendants during the relevant time period, and that all three (Coyne, Grim, and Fratto) were principals on the bond during their respective terms in office. Fidelity also failed to raise this defense until more than nine years after Kinzer filed her original complaint; thus, it was clearly within the trial court's discretion to deny it as untimely. *Turner v. Cosmopolitan National Bank* (1989), 180 Ill. App. 3d 1022, 1029, 536 N.E.2d 806.

Moreover, the defense lacks merit substantively because the term "individual" does not appear in section 3—14—3, nor, contrary to Fidelity's claim, does the statutory scheme suggest that the use of the term "execute" in that section requires a city comptroller to furnish an "individual bond." See Ill. Rev. Stat. 1985, ch. 24, pars. 3—11—21 through 3—11—24 (now 65 ILCS 5/3—11—21 through 3—11—24 (West 1992)).

■ Fidelity further contends that the November 12, 1993, partial summary judgment order was not based on Geary's alleged conduct, but only on that of the three comptrollers, and that therefore the trial court's order limiting Fidelity's liability to $1,075,000 should be reduced by $25,000.

However, in failing to argue this issue when it opposed Kinzer's motion for partial summary judgment, and because its own counsel prepared the March 18, 1992, order which limited that liability to $1,075,000, Fidelity has waived review of this issue on appeal. *Boumenot v. North Community Bank* (1992), 226 Ill. App. 3d 137, 145, 590 N.E.2d 126; *Mendelson v. Lillard* (1980), 83 Ill. App. 3d 1088, 1096, 404 N.E.2d 964.

In any event, Geary's involvement in the misuse of Fund 666 monies is well documented in the record; specifically, his activity was included in Kinzer's memorandum in support of her August 2, 1989, motion for partial summary judgment, which she renewed on November 2, 1989; and Geary's deposition transcripts reveal that during his term as Mayor Byrne's chief of staff between August 1980 and April 1983, he signed and approved numerous purchase requisitions and vouchers for the release of the funds through the medium of Fund 666.

Likewise, in this vein, we hold that Fidelity's contention that Kinzer failed to offer evidence adequately attributing the loss at issue to each of the City's employees, thereby not affording the trial court with a basis upon which to calculate the damages properly, is also waived because Fidelity failed to raise it in opposing Kinzer's motion for summary judgment. Furthermore, the record, in addition to revealing Geary's involvement, includes a May 1993 affidavit of Kinzer's expert, indicating that of the $31,957,341 in illegal Fund 666

expenditures, $3,362,701 was paid during Coyne's term in office (August 1979 through June 1980); $13,465,132 was paid in Grim's term of office (June 1980 through September 1981); and $15,129,508 was paid during Fratto's term of office (September 1981 through April 1983).

For the above-stated reasons, we affirm the trial court's partial summary judgment as to Fidelity's liability under the bond.

■ Next, we affirm the trial court's ruling that the term "loss" as used in the bond should not be interpreted in the singular, *i.e.*, each illegal expenditure did not constitute a separate recoverable loss; rather, the term should be interpreted in the plural, *i.e.*, the illegal expenditures *in toto* constituted one recoverable loss. We further affirm that the City's loss must be calculated by setting off the profits generated by the illegal expenditures from the total amount of such expenditures.

Under insuring agreement 3, and subject to other provisions of the bond, Fidelity agreed to indemnify the employees for the use and benefit of the City for:

> "Loss caused to the Insured through the failure of any of the Employees, acting alone or in collusion[3] with others, to perform faithfully his duties or to account properly for all monies and property received by virtue of his position or employment during the bond Period to an amount not exceeding in the aggregate the amount [of $975,000]."

Section 4 of the bond, which is commonly referred to as a "non-reduction in liability" clause, and which contains a limiting proviso, reads in pertinent part:

> "Indemnification by [Fidelity] for any loss under Insuring Agreement *** 3 shall not reduce [its] liability for other losses under the applicable Insuring Agreement, whenever sustained; provided, however, that [its] total liability under [that] Insuring Agreement

---

[3]Fidelity additionally argues that the City officials acted in collusion when they failed to account properly for the expended funds, but such a claim lacks merit. "Collusion" is not defined in the bond, but Black's Law Dictionary defines it as "impl[ying] the existence of fraud of some kind." (Black's Law Dictionary 264 (6th ed. 1990).) Further, according to Webster's Third New International Dictionary, the word "collude" means to "connive with one another: CONSPIRE, PLOT" and the word "collusion" means "secret agreement: secret cooperation for a fraudulent or deceitful purpose." (Webster's Third New International Dictionary 446 (1986).) In *Kinzer I*, the supreme court indicated that Grim acted in "good faith," and the fact that a comptroller simply followed the practice of his predecessor is insufficient to show collusion. *Kinzer I*, 128 Ill. 2d at 445.

for any loss caused by any Employee or in which such Employee is concerned or implicated is limited to the [amount of $975,000]." Section 4 also provides for a similar limitation with respect to insuring agreement 4, which provides a layer of coverage of up to $25,000 per employee.

Kinzer unconvincingly maintains that the City sustained a recoverable "loss" each time an illegal expenditure was made and that section 4 limits Fidelity's liability as to each loss, not as to the aggregate amount of each loss. Citing authority we do not find persuasive, she asserts that a loss is sustained at the time of the original wrongdoing (*American Trust & Savings Bank v. United States Fidelity & Guaranty Co.* (Iowa 1988), 418 N.W.2d 853), when funds are first diverted (*Fitchburg Savings Bank v. Massachusetts Bonding & Insurance Co.* (1931), 274 Mass. 135, 174 N.E. 324), or when the misconduct first occurred (*Citizens Bank v. American Insurance Co.* (D. Or. 1968), 289 F. Supp. 211). She also relies on *Bankers Life Co. v. Aetna Casualty & Surety Co.* (Iowa 1985), 366 N.W.2d 166, and *Humboldt Trust & Savings Bank v. Fidelity & Casualty Co.* (1963), 255 Iowa 524, 122 N.W.2d 358.

Under her reasoning, because no separate expenditure exceeded section 4's limit of liability, Fidelity would be liable for the total amount of unappropriated Fund 666 expenditures, which according to Kinzer amounts to $31,957,341 plus interest. We decline, however, to equate the term "loss" as used in the bond to each illegal expenditure; instead, we deem it more appropriate to follow the "general [rule] that 'an occurrence is determined by the cause or causes of the resulting injury.'" *Business Interiors, Inc. v. Aetna Casualty & Surety Co.* (10th Cir. 1984), 751 F.2d 361, 363, quoting *Appalachian Insurance Co. v. Liberty Mutual Insurance Co.* (3d Cir. 1982), 676 F.2d 56, 61, and citing, *inter alia*, 8B J. Appleman & J. Appleman, Insurance Law & Practice § 4891.25, at 16 (1981).

In the case just cited, because Business Interiors' loss was the continued dishonesty of an employee, the court reasoned that " 'the probable intent of the employee with regard to the last thirty-nine checks [was] essentially the intent to continue the dishonesty, not to commit an entirely new and different act of dishonesty.' " (Brackets in original.) (*Business Interiors, Inc.*, 751 F.2d at 363 (quoting the district court).) Similarly, here, as the trial judge noted, "the totality of circumstances which found their way over a 4-year practice of adopting the [accounting] techniques which had given rise to Fund 666" was "one event" constituting "one loss," and thus, under section 4, Fidelity's total liability is limited to $1,075,000; $975,000 under insuring agreement 3, plus $100,000 ($25,000 for each employee) under insuring agreement 4.

Therefore, we conclude that the illegal accounting practice which initially created Fund 666 was the single occurrence which generated each of the resulting illegal expenditures. Other cases, although the terms of the bonds at issue in them vary somewhat from the disputed terms here, support such a result. *Roodhouse National Bank v. Fidelity & Deposit Co.* (7th Cir. 1970), 426 F.2d 1347 (a series of forgeries occurring over a number of years constituted one loss to which the limit of liability applied); *Federal Savings & Loan Insurance Corp. v. Aetna Insurance Co.* (N.D. Ill. 1968), 279 F. Supp. 161 (multiple misdeeds of bank director constitute one loss under bond's limit of liability); see also *SEC v. Arkansas Loan & Thrift Corp.* (W.D. Ark. 1969), 297 F. Supp. 73, *aff'd* (8th Cir. 1970), 427 F.2d 1171.

Kinzer also maintains that the trial judge erred when he read a setoff provision into the bond. *National Surety Corp. v. Rauscher, Pierce & Co.* (5th Cir. 1966), 369 F.2d 572; see also *HS Equities, Inc. v. Hartford Accident & Indemnity Co.* (2d Cir. 1979), 609 F.2d 669 (district court did not err in refusing to imply a setoff provision in bond Hartford issued to HS), citing *National Security Corp.* with approval.

However, we agree with the trial judge, sitting in equity, that the City's loss must be set off by the profits generated by the illegal Fund 666 expenditures because otherwise the "loss" occasioned by those expenditures would continue to qualify as a loss even if they generated a "handsome return," resulting in an undeserved windfall to the City. Although not the case here, the possibility of a positive return from the unappropriated funds necessitates the incorporation of the concept of a "gain" into the determination of the City's actual loss occasioned by the expenditures. Such reasoning is buttressed by the reality that the detriment to the public from the expenditure of unappropriated funds can be measured only by employing the following calculus: the totality of expenditures minus the benefit the public received therefrom. In other words, as a matter of *civil* law, no harm, no foul.

Such a formula gives the City the benefit of its bargain for the agreement with Fidelity and concomitantly stays true to the factual reality associated with assessing the loss caused by the illegal expenditure of funds. Indeed, in the absence of such a calculus, the insured would be motivated to bury its head in the sand while illegal conduct on the part of its employees, which might prove profitable, is allowed to continue, thereby creating the possibility of not only reaping the benefits of that illegal conduct, but also recovering doubly against its surety. Equity should not, indeed, cannot countenance recovery where, as here, the "loss" is actually not as represented by Kinzer.

The only purpose to be served by adopting her position on this issue would be a punitive one, and, therefore, contraindicated in this case. Similar compelling policy considerations were recognized in *HS Equities, Inc.*, but were found not controlling because the serious consequences attached to SEC disciplinary proceedings constituted ample deterrence against the misconduct at issue there. *HS Equities, Inc.*, 609 F.2d at 673.

Fidelity goes too far, however, in arguing that not only is it entitled to a setoff of direct Fund 666 revenues, but that it should be allowed to deduct estimated indirect tax benefits as well. In support of this contention Fidelity submitted the affidavits of two experts and Ernst & Young's "Analysis of Accounting and Economic Benefits Related [to] Fund 666," which, using an "input-output" accounting model, indicated that the City received a net economic benefit of $801,020.

In ruling against Fidelity on this issue, the trial judge noted that his instructions were that "*the revenue actually recovered* by the City" be set off, not "the *benefits received*"—the language used by Fidelity itself when it memorialized his ruling into a written order. (Emphasis in original.) He further correctly commented:

> "The input-output model utilized by Fidelity's experts may have legitimacy in forecasting the future likelihood of a revenue flow from certain theoretical circumstances but it has no utility in counting cash on hand. Additionally, the introduction of estimated revenues into one side of the balance sheet invites, indeed compels, the acceptance of similarly unverifiable additional expenses such as police, fire, sanitation and utilities into the other side."

Accordingly, we conclude that (1) the compilation of illegal expenditures amounts to one occurrence of loss under the bond; (2) Fidelity's total potential liability under the bond for this one occurrence is $1,075,000: $975,000 under insuring agreement 3, plus $100,000 ($25,000 for each employee) under insuring agreement 4; and (3) the complete loss suffered by the City is to be calculated by deducting the "revenue actually recovered by the City" from the total of the illegal funds expended by the its officials.

■ Next, we address whether the bond's automatic cancellation provision (section 6(a)) is valid, and if so, what level of knowledge constitutes discovery; further, given that level of knowledge, whether as a matter of law the City can be held to have discovered the loss associated with the illegal expenditures on the date Kinzer filed her complaint, August 2, 1982.

The pertinent language of the cancellation provision provides:

> "This Bond shall be deemed canceled as to any Employee *** [i]m-

mediately upon discovery by the Obligee or the Insured of any act on the part of such Employee which would constitute a liability of the Surety under the applicable Insuring Agreement covering such Employee."

Provisions like section 6(a) are well recognized as being reasonable; to conclude otherwise would be contrary to fundamental fairness and public policy—the City should not be compensated for losses caused by the misconduct of its employees of which it was aware and did nothing to prevent. (See, *e.g., Home Savings & Loan v. Aetna Casualty & Surety Co.* (Utah Ct. App. 1991), 817 P.2d 341, *petition for cert. filed* (1991), 171 Utah Adv. Rep. 67; *Newhard, Cook & Co. v. Insurance Co. of North America* (8th Cir. 1991), 929 F.2d 1355; *Foote, Cone & Belding Communications, Inc. v. Federal Insurance Co.* (N.D. Ill. 1990), 749 F. Supp. 892; *E. Udolf, Inc. v. Aetna Casualty & Surety Co.* (1990), 214 Conn. 741, 573 A.2d 1211; *Central Progressive Bank v. Fireman's Fund Insurance Co.* (5th Cir. 1981), 658 F.2d 377; *Maryland Casualty Co. v. Clements* (1971), 15 Ariz. App. 216, 487 P.2d 437; *Ritchie Grocer Co. v. Aetna Casualty & Surety Co.* (8th Cir. 1970), 426 F.2d 499; *St. Joe Paper Co. v. Hartford Accident & Indemnity Co.* (5th Cir. 1967), 376 F.2d 33; see also 13 Couch on Insurance 2d §§ 46:248—249, at 184-85 (M. Rhodes rev. 1982); 11B J. Appleman & J. Appleman, Insurance Law & Practice § 6978, at 464 (1981).

How aware must the City have been to activate the cancellation provision? When insuring agreement 3 is naturalized into section 6(a), the result is as follows:

"This Bond shall be deemed cancelled as to any Employee [i]mmediately upon discovery by the [City] of any ['failure of any of the Employees *** to account properly for all monies *** received by virtue of his position']."

The definition of "discovery" has been construed in many cases to "mean[ ] that time when the insured gains sufficient factual knowledge, not mere suspicion, which would justify a careful and prudent man in charging another with dishonesty." (*Alfalfa Electric Cooperative, Inc. v. Travelers Indemnity Co.* (W.D. Okla. 1973), 376 F. Supp. 901, 906, 911-12 (applying the foregoing definition to a number of discovery conditions that were conditions precedent to coverage under a fidelity bond, including a provision that terminated coverage upon discovery by the insured of any dishonest act on the part of its employees).) In this case, rather than discovery of dishonesty, we are concerned with the City's discovery of the failure of its implicated employees "to account properly" for monies expended for City-sponsored events through the creation and use of "Fund 666."

Further, in order to trigger a provision which terminates coverage of an employee once the insured discovers that employee's misconduct, the insured must be "aware of the true nature of the events which have given rise to the allegation." (*General Finance Corp. v. Fidelity & Casualty Co.* (8th Cir. 1971), 439 F.2d 981, 987; see also *Newhard, Cook & Co.*, 929 F.2d at 1357; Annot., 23 A.L.R.2d 1065, 1076 (1949).) Additionally, Couch on Insurance states:

> "A policy of fidelity insurance may protect the insurer against the insured's continuing to employ a known defaulter by specifying that the coverage of the policy shall terminate as to any employee upon the discovery of his default. Such a provision is to be strictly construed so that when knowledge of the insured partner is required to make the exclusion operative, *actual knowledge* of a partner is required ***." (Emphasis added.) 13 Couch on Insurance 2d § 46:248, at 185 (M. Rhodes rev. 1982).

Accordingly, we conclude that section 6(a) would be brought into play in this case once the City was in possession of actual knowledge which would justify a careful and prudent man in charging the implicated employees with failing "to account properly" for monies expended for City-sponsored events through the creation and use of "Fund 666."

When did the City here possess the requisite knowledge for the cancellation provision to have applied? Arguing that the City knew before August 2, 1982, that it was expending funds without prior appropriation, Fidelity asserts the following: (1) on December 8, 1980, and July 7, 1981, the 1979 and 1980 annual reports, respectively, were furnished to the city council, both disclosing that funds had not been appropriated for Fund 666 events sponsored during those years, (2) prior to those reports, the city council authorized the planning and execution of various events knowing that as of that time no funds had been appropriated for them, and (3) in May 1982, the Better Government Association (the BGA) publicly announced the results of its investigation of the events, charging the City with spending money on them absent prior appropriation.

Kinzer responds that the City could not have had knowledge of "any act *** which would constitute liability" until after she filed her suit since from the inception of Fund 666 during Mayor Byrne's administration everyone, including the City's corporation counsel, had concluded that the acts complained of violated no law, as is evidenced by the fact that the City entered into contracts to cover six additional festivals after this suit was filed. In support, she notes that the City officials and Fidelity were not named as defendants until she filed her second amended complaint in August 1983, and that only af-

ter a change in the City administration in the spring of 1993 did the then City comptroller, at the request of the new corporate counsel, commence an investigation of Fund 666.

J. Appleman, Insurance Law and Practice, which we find instructive, states:

> "Under a fidelity bond providing that it should terminate upon the discovery by an employer of 'any fraudulent or dishonest act' on the part of a bonded employee, the quoted words imply positive acts of wrongdoing, the discovery of which releases the insurer from its obligation on the bond. Whether or not the employer prior to the defalcation upon which an action is based had obtained knowledge of dishonest acts is a *question of fact*." (Emphasis added.) 11B J. Appleman & J. Appleman, Insurance Law & Practice § 6978, at 465-67 (M. Rhodes rev. 1981).

In light of the standard of review of summary judgments, when the City actually knew of "any act *** which would constitute liability" under the bond or of the "failure of any *** Employee[ ] to account properly for all [Fund 666] monies" is a question of fact, not to be decided as a matter of law. *Quality Lighting, Inc.*, 227 Ill. App. 3d at 884; *Gardner*, 213 Ill. App. 3d at 250 (in summary judgment motions, once the nonmovant presents some evidence to raise factual disputes regarding an element of the claim, that evidence must be construed strictly against the movant and liberally in favor of the nonmovant).

Therefore, summarizing, we hold that section 6(a) is valid, is governed by an objective view of what the City should have concluded from facts of which it was actually aware, and that when the City "discovered" that the expenditure of Fund 666 monies constituted a liability under the bond is a question of fact.

The answer to the question as to who constitutes "the City" under the bond is necessarily subsumed in determining the issue of when the City is held to have discovered the requisite failure of its implicated employees "to account properly" for the funds at issue in this litigation. Although noting that the language of the bond was ambiguous as to "the official/officials of city government (executive, legislative, administrative, clerical) whose knowledge [would] satisfy Section 6(a)[,]" the trial judge felt that by "[l]inking discovery to the filing of the original complaint [he had] obviated the need to resolve [this ambiguity] because notice of filing [was] served, under law, on multiple city officials and that under those circumstances knowledge of the suit cannot be denied."

Since the City is a corporation and can act only through and by its agents, the law of agency would necessarily apply in the resolution of this issue.

" 'Generally speaking, a principal is chargeable with notice of facts which are within the knowledge of his agent, acquired within the scope of the agent's authority. A well recognized exception to this rule is that, where an agent acquires information which it would be to his advantage to conceal from his principal, it is assumed that he did not impart such knowledge to his principal, and accordingly knowledge would not be imputed to the principal. This exception, however, is qualified by the rule that, if the agent is the sole representative of the principal, or the only person or means by which the principal acts, then the knowledge of the agent will be imputed to the principal, and the general rule applies, and not the exception thereto.' " (*Puget Sound National Bank v. St. Paul Fire & Marine Insurance Co.* (1982), 32 Wash. App. 32, 40, 645 P.2d 1122, 1127.)

Although we are in accord with the above-quoted paragraph, we add to it the caveat that only the "knowledge of *key* employees" may be imputed to the City. (Emphasis added.) *First National Bank v. Transamerica Insurance Co.* (8th Cir. 1975), 514 F.2d 981, 986.

■ Fidelity next contends that since it was not named as a defendant in this action until August 18, 1983, the trial judge erred in assessing against it prejudgment interest from the original date the complaint was filed, which was August 12, 1982.

However, this issue was not raised in Fidelity's trial court briefs nor in its argument in opposition to Kinzer's motion for summary judgment, which specifically prayed for prejudgment interest to begin on August 12, 1982, nor was it raised in its motion to reconsider the grant of summary judgment. Further, Fidelity fails to cite any authority for this contention, nor does it respond to Kinzer's waiver argument here; consequently, we deem this issue waived. *In re Gonzalez* (1981), 95 Ill. App. 3d 750, 756-57, 420 N.E.2d 720; 134 Ill. 2d R. 341(e)(7).

■ Five days after the trial judge granted Kinzer's summary judgment motion but before ruling on Fidelity's post-trial motion to reconsider, Kinzer filed, under a provision of the Insurance Code (215 ILCS 5/155 (West 1992)), a motion for attorney fees and costs, which the trial judge refused to entertain since "for all intents and purposes[ ] this action is concluded." Thereafter, the judge also denied Kinzer's request to amend her complaint to include a section 155 claim.

"In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may

allow as part of the taxable costs in the action reasonable attorney fees, [and] other costs." 215 ILCS 5/155 (West 1992).

The policy behind section 155 is to prevent harm to an insured who encounters an unreasonable and vexatious insurance company. (*Meier v. Aetna Life & Casualty Standard Fire Insurance Co.* (1986), 149 Ill. App. 3d 932, 943-44, 500 N.E.2d 1096.) Because the "action" here was still open as long as the trial judge retained jurisdiction over the case, the disincentives created by section 155 remained in effect so as to further the policies evinced by that section and the cases that have interpreted it. Accordingly, we hold that the trial judge erred in not entertaining Kinzer's motion; consequently, we need not address whether the judge abused his discretion in disallowing Kinzer to amend her complaint.

■ Lastly, Kinzer contends that the trial judge abused his discretion in denying her request under Supreme Court Rule 137 for sanctions.

The determination of whether to grant sanctions is entrusted to the sound discretion of the trial judge and will not be reversed absent an abuse thereof. (*Shea, Rogal & Associates v. Leslie Volkswagen, Inc.* (1993), 250 Ill. App. 3d 149, 152-55, 621 N.E.2d 77.) In light of the fact that the trial judge had been assigned to this case more than two years prior to denying Kinzer's motion for sanctions, and thus was well informed and familiar with the facts, issues, and parties therein, we uphold his denial of sanctions.

Reversed and remanded.

HARTMAN and McCORMICK, JJ., concur.