Irving H. ROZENFELD, Plaintiff–Appellee, Cross–Appellant,

v.

**MEDICAL PROTECTIVE COMPANY,** Defendant–Appellant, Cross–Appellee.

Nos. 95–1535, 95–1610.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 7, 1995.

Decided Jan. 4, 1996.

Christopher D. Oakes, Charles E. Dobrusin, Shefsky, Froelich & Devine, Chicago, IL, Clifford E. Yuknis (argued), Thomas J. Lipscomb, Lipscomb & Yuknis, Chicago, IL, for plaintiff-appellant.

D. Patterson Gloor, David C. Van Dyke, Cassiday, Schade & Gloor, Chicago, IL, Lynn D. Dowd (argued), Levin, McParland, Phillips, Leydig & Haberkorn, Chicago, IL, for defendant-appellee.

Before POSNER, Chief Judge, COFFEY, Circuit Judge, and SKINNER, District Judge.*

POSNER, Chief Judge.

This is a diversity suit, governed by the law of Illinois, for the breach of a contract of liability insurance. The plaintiff is a physician, Dr. Rozenfeld, who in 1970 had prescribed the drug Mebaral, an anti-convulsive drug, for an epileptic woman named Karen Herman. He represcribed the drug for her in 1972. Two years later, in April of 1974, Mrs. Herman, who was now pregnant, called Dr. Rozenfeld (whom she had not seen in the interim) and told him, for reasons that are unclear, that he was damaging her baby. Apparently the reference was to his having prescribed Mebaral for her. The prescription that he had given her in 1972 had long since run out (it was only for a four-month supply of the drug), but her father, himself a physician, had refilled it. At all events, in this telephone conversation, and another one later in the month, Dr. Rozenfeld told Mrs. Herman to reduce the dosage gradually to zero.

A month later she came to see him. She was no longer taking the drug, and he told her to stay off it as long as she was doing well. This was the last time he saw her until after her baby was born. In August, Mrs. Herman had a gran mal seizure. The baby was born the following month with serious birth defects. Dr. Rozenfeld put Mrs. Herman back on Mebaral in November. In 1983 a suit for medical malpractice was brought against Rozenfeld on behalf of the injured child. Medical Protective Company ("Med Pro"), a malpractice insurer, defended Dr.

Rozenfeld. The parties settled for $300,000, but Med Pro refused to pay more than $200,000, precipitating this suit.

■ Dr. Rozenfeld had three policies from Med Pro. The first provided coverage from July 13, 1973, to July 13, 1974, the second from July 13, 1974, to July 13, 1975, and the third from July 13, 1976, to July 13, 1977. The first policy, which is the one Med Pro believes applicable to the malpractice suit, had a limit of only $200,000 per occurrence. The second policy, which is the one that Rozenfeld believes applicable, had a limit of $1 million. The district judge agreed with Rozenfeld and so awarded him $100,000 in damages. But the judge declined to hold that Med Pro's denial of coverage had been "vexatious and unreasonable" and so declined to award Rozenfeld the limited punitive damages authorized by 215 ILCS 5/155(1), which preempts the common law right to punitive damages in a suit against an insurance company for denying coverage unreasonably or in bad faith. *Cramer v. Insurance Exchange Agency*, 275 Ill.App.3d 68, 211 Ill.Dec. 436, 438, 655 N.E.2d 465, 467 (1995), app. allowed, Ill.S.Ct., Dec. 6, 1995. Both parties appeal.

■ The first and second policies insured Rozenfeld against "any claim for damages, at any time filed, based on professional services rendered or which should have been rendered ... in the practice of the insured's profession ... during the term of this policy." Med Pro argues that the professional service upon which the Hermans' claim was based was Rozenfeld's direction to Mrs. Herman in April and May of 1974, during the term of the first policy, to phase out and then stay off Mebaral. This interpretation of the policy is consistent with the policy's language. The policy speaks of "professional services rendered or which should have been rendered," rather than of the tort of medical malpractice. A tort does not occur when the tortfeasor violates his duty of care to the victim, but when the tortfeasor injures the victim. *Town of Thornton v. Winterhoff*, 406 Ill. 113, 92 N.E.2d 163, 166 (1950); *Rice v. Nova Biomedical Corp.*, 38 F.3d 909, 915

* Hon. Walter Jay Skinner of the District of Massachusetts, sitting by designation.

(7th Cir.1994). Dr. Rozenfeld's action in taking Mrs. Herman off Mebaral inflicted no injury until she had the convulsion, and that did not occur until August 1974, which was in the second policy period. But this means that if the policy is a policy of insurance against liability for torts committed (or alleged to be committed, for the Hermans' claim was settled without a determination of Dr. Rozenfeld's liability) during the policy period, the applicable policy is the second, not the first.

Med Pro asks us to distinguish between the breach of the duty of care and the "manifestation" of the injury resulting from that breach. The suggested distinction is imprecise. There is the breach of the duty of care; there is the injury resulting from it; and there is the *manifestation* of that injury, which may be long delayed. A physician who makes a mistake during an operation may injure tissues yet the injury produce no symptoms for many years. The injury and its manifestation would not coincide. The distinction is primarily relevant to the statute of limitations, although it sometimes arises in cases in which it is unclear when exactly the injury insured against took place. See *Eljer Mfg., Inc. v. Liberty Mutual Ins. Co.*, 972 F.2d 805, 809 (7th Cir.1992). The distinction does not figure in our case. There is no suggestion that taking Mrs. Herman off Mebaral injured her. Mebaral was just a protection against convulsions, an injury preventive. It was months before there was any injury.

■ If the policies issued to Dr. Rozenfeld had said that he was being insured against claims arising from torts committed during the policy period, then it would be clear that the second policy was applicable rather than the first, because there is no tort without injury and there was no injury until the second period. It would be only slightly less clear if the policies covered "accidents." If you step on the accelerator when you mean to step on the brake, the "accident" does not occur until, as a consequence of your mistake, you plow into the car in front of you. And so with Dr. Rozenfeld's having taken his patient off Mebaral—this set the stage for the "accident," the convulsion that injured Mrs. Herman's fetus, but was not the accident. The general rule, and it is the rule followed in Illinois, is that an "accident" does not "occur," within the meaning of a policy of liability insurance, until the person claiming against the insured is injured. *Great American Ins. Co. v. Tinley Park Recreation Comm'n*, 124 Ill.App.2d 19, 259 N.E.2d 867 (1970); *Millers Mutual Fire Ins. Co. v. Ed Bailey, Inc.*, 103 Idaho 377, 379, 647 P.2d 1249, 1251 (1982); *Baylor Heating & Air Conditioning, Inc. v. Federated Mutual Ins. Co.*, 987 F.2d 415, 418 (7th Cir.1993) (Indiana law); 11 *Couch on Insurance* § 44:8 (2d ed. 1982, and June 1995 Supp.). *Lund v. American Motorists Ins. Co.*, 797 F.2d 544 (7th Cir.1986), is to the contrary, but we were deferring, as we had to because it was a diversity case governed by Wisconsin law, to Wisconsin's rejection of the general rule.

The policies in issue here do not use "accident," or some equivalent word connoting impact or injury; and some cases that construe policies which, like the ones here, define coverage by reference to the acts or omissions of the insured, rather than to the accidents (and hence injuries) caused by those acts or omissions, have held that coverage exists if the act or omission occurs during the policy period. E.g., *Travelers Ins. Co. v. National Union Fire Ins. Co.*, 207 Cal.App.3d 1390, 255 Cal.Rptr. 727, 730 (1989); *Schultheis v. Centennial Ins. Co.*, 108 Misc.2d 725, 438 N.Y.S.2d 687 (Sup.Ct.1981). We rejected this approach in *American Home Assurance Co. v. Dykema, Gossett, Spencer, Goodnow & Trigg*, 811 F.2d 1077, 1085 (7th Cir.1987), interpreting Illinois law; but the decision is strongly criticized in 2 Allan D. Windt, *Insurance Claims and Disputes: Representation of Insurance Companies and Insureds* § 11.05, pp. 220–21 (3d ed. 1995); and, since it was decided, two decisions by Illinois' intermediate appellate court have intimated that when a liability policy insures against claims arising from an occurrence or from an act or omission the date of the injury may be irrelevant. *Pekin Ins. Co. v. James & Addems Chevrolet, Inc.*, 263 Ill. App.3d 399, 200 Ill.Dec. 843, 847, 636 N.E.2d 34, 38 (1994); *Kinzer v. Fidelity & Deposit Co.*, 273 Ill.App.3d 211, 209 Ill.Dec. 706, 712, 652 N.E.2d 20, 26 (1995). These are brief

dicta, however, and their significance as predictors of what the state's highest court would do if presented with the issue is, to say the least, uncertain.

Med Pro places much greater weight on another recent decision by the intermediate appellate court, *Hartford Casualty Ins. Co. v. Medical Protective Co.*, 266 Ill.App.3d 781, 204 Ill.Dec. 321, 641 N.E.2d 545 (1994)—understandably, since it involved the identical policy language in a policy issued by the same insurer. But the case is not in point. It was a case in which the insured tried to "stack" successive policies in order to increase the limits of coverage of each. A physician had failed to diagnose a patient's ear condition and as a result the patient had suffered a hearing loss that extended over several policy periods. The physician wanted to add together the limits of the successive policies in order to increase his coverage. As it was not the parties' intent to permit the stacking of policies, he lost. The opinion does say that "where each of a series of related injuries flow[s] from a single cause, it is a single occurrence." *Id.* 204 Ill.Dec. at 325, 641 N.E.2d at 549. But all that this means, so far as the present case is concerned, is that if the convulsion had caused successive injuries to Mrs. Herman or her fetus, and these injuries had straddled the two policy periods, Dr. Rozenfeld could not have added $200,000 to $1 million to create a $1.2 million fund out of which to reimburse him for whatever damages judgment or settlement the Hermans obtained from him for all the child's injuries. That is not what Rozenfeld is trying to do. He is trying only to collect under the second policy, the policy with the $1 million limit.

The case law is obviously in disarray and the "general rule" so confidently stated in *Couch on Insurance* and elsewhere may well be an overgeneralization. Cf. 2 Windt, *supra*, § 11.04, pp. 200–01. The best "rule" may be to attend carefully to the specific wording of the policy and the character of the liability insured against—whether the act or omission giving rise to the liability and the injury resulting from that act or omission are usually very close together in time or often more separated in time.

The most natural interpretation of the policies at issue in this case is that they insure Dr. Rozenfeld against the consequences of a tort of malpractice during the policy period; and the tort did not take place until the convulsion. After all, these are *liability* policies, and there is no liability until the insured commits a tort, and there is no tort until there is an injury. But in reaching this conclusion we place no weight on the language of the third policy, which provides that "all injury resulting from a series of acts or omissions in rendering professional services to one person" shall be "considered as arising from one occurrence," presumably the first act or omission. As is so often true of subsequent enactments, see, e.g., *Telegraph Savings & Loan Ass'n v. Schilling*, 807 F.2d 590, 593 (7th Cir.1986); *In re Tarnow*, 749 F.2d 464, 467 (7th Cir.1984), it is unclear whether this language was intended to change or merely to clarify the language of the previous policy. Its only significance to our analysis is in bringing forward Rozenfeld's alternative theory of coverage, which also strikes us as sound, that the Hermans' suit alleged a distinct breach of care in the second policy period: Rozenfeld's failure to monitor Mrs. Herman's condition after he took her off Mebaral.

■ The policy of the *Hartford* decision against stacking would be undermined if an insured could characterize a breach of the duty of care as a continuing rather than one-time violation of that duty—continuing over successive policy periods until the injury resulting from the breach ended, which might, of course, not be until the plaintiff had died; this may be the case here, if the birth defects are permanent, as we gather they are, since they include mental retardation. But this is not the simple case in which the physician commits a single breach of care and the injuries from it unfold over a lifetime. When Dr. Rozenfeld, knowing that Mrs. Herman was pregnant, took her off anti-convulsive medication, he should have known that he was endangering her fetus. His action in taking her off the medication could be thought to have created a duty in him to monitor her condition in order to protect the fetus. At the very least he should have

warned her gynecologist. Perhaps he did. All we have to go on is the complaint in the Hermans' suit. The complaint alleges failure to monitor as a separate act of medical negligence; and because the case was settled before there was any judicial determination of Rozenfeld's liability, we must accept the allegations of the complaint as true for purposes of determining Rozenfeld's rights under the insurance policy. *American Home Assurance Co. v. Dykema, Gossett, Spencer, Goodnow & Trigg, supra,* 811 F.2d at 1083. Those allegations establish not one act of negligence with continuing consequences but two acts one of which occurred in the second policy period. This is not an exotic theory of negligence, or one that converts every omission into a continuing tort. If you injure a person through negligence—even if you do so without negligence—the injury imposes on you a duty of rescue, and the breach of that duty is a separate, second tort. *Moore v. City of Lewiston,* 596 A.2d 612, 619 (Me. 1991); *Taylor v. Meirick,* 712 F.2d 1112, 1117 (7th Cir.1983); *South v. National Railroad Passenger Corp.,* 290 N.W.2d 819, 837 (N.Dak.1980); *Restatement (Second) of Torts* § 322 (1965).

■ The best argument that we can think of against the district court's interpretation of the policies is one that Med Pro does not make. It is that the interpretation may actually disserve insureds as a group, though benefiting Dr. Rozenfeld in this case—and this apart from the possibility that the policy limits might have been reversed (that is, the higher limit might have been in the first rather than in the second policy) or that in the second period the insured might have switched from an occurrence or acts and omissions policy to a claims-made policy. Consider a case in which the insured commits an act of patent and potentially very harmful medical negligence during the current policy period but, as in this case, no injury occurs during that period. Then he will not be covered by the policy in force during the period. When at the end of the period he comes to renew the policy he will be obligated to advise the insurance company of any potential liability of which he is aware, *Giles v. Allstate Ins. Co.,* 871 S.W.2d 154, 155 (Tenn.Ct.App.1993); *Prudential Property &*

*Casualty Ins. Co. v. Cole,* 586 S.W.2d 433 (Mo.Ct.App.1979); 9 *Couch on Insurance, supra,* § 38:2—and the company will refuse to renew the policy. This duty of disclosure exists even when the application for insurance does not require such disclosure explicitly. *Id.,* §§ 38:6, 38:58, 38:59. Dr. Rozenfeld's applications for the insurance policies issued by Med Pro are not in the record.

■ Consistent with this analysis we held in *Eljer Mfg., Inc. v. Liberty Mutual Ins. Co., supra,* that "physical injury" within the meaning of a liability insurance policy occurred when the insured, a plumbing manufacturer, installed defective pipe in houses rather than when the pipe started to leak, since by the time that happened the amount of loss would be known to a sufficient certainty to make it impossible or nearly so for the manufacturer to insure. Similarly, *Travelers Ins. Co. v. National Union Fire Ins. Co., supra,* 255 Cal.Rptr. at 730, in holding that coverage under a lawyer's malpractice policy attached when he drafted the will rather than when the beneficiaries were harmed by the failure of the will to minimize estate tax, emphasized the long interval between the negligent act and the harmful consequence. Since Med Pro does not make the argument we have just sketched and cites neither *Eljer* nor *Travelers,* and since for all we know the danger that we have just conjured up is a slight one (in this case, for example, Rozenfeld surely was not aware when he renewed the policy that he had been negligent in taking Mrs. Herman off Mebaral), we do not think that we should rely upon it to reverse the district court. But it casts enough doubt on the ultimate rightness of our decision to show that Rozenfeld's cross-appeal must fail. The insurance company's position denying him the insurance proceeds that he sought was at least arguable; no inference of unreasonableness in pressing it can be drawn. *Stevenson v. State Farm Fire & Casualty Co.,* 257 Ill.App.3d 179, 195 Ill. Dec. 346, 349, 628 N.E.2d 810, 813 (1993); *American Casualty Co. v. B. Cianciolo, Inc.,* 987 F.2d 1302, 1306 (7th Cir.1993) (Wisconsin law); *TPLC, Inc. v. United National Ins.*

*Co.,* 44 F.3d 1484, 1497 (10th Cir.1995) (Colorado law).

Affirmed.